# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No.

In re Application of PALANTIR TECHNOLOGIES
INC. for an Order Pursuant to 28 U.S.C. § 1782 to
Obtain Discovery for Use in Foreign Proceedings

---

### DECLARATION OF WOLRAD PRINZ ZU WALDECK UND PYRMONT

---

I, Wolrad Prinz zu Waldeck und Pyrmont, an attorney admitted to practice in Germany, declare under penalty of perjury under the laws of the United States as follows:

1.    I am a partner in the Dusseldorf office of the law firm Freshfields Bruckhaus Deringer LLP, which represents Palantir Technologies, Inc. (***Palantir***) in the litigation Palantir has brought in Germany against Marc L. Abramowitz (***Abramowitz***) and which is currently pending with the Regional Court Munich I (***German Court***) with docket no. 21 O 11054/18 (the ***German Proceeding***).

2.    I submit this Declaration in support of Palantir's application to this Court pursuant to Section 1782 Title 28 of the U.S. Code.

3.    I make this Declaration based on my own personal knowledge and based on documents that I have reviewed.

4.    I submitted four declarations in the proceedings captioned Palantir Technologies, Inc. v. Marc L. Abramowitz, filed in the Northern District of California on August 13, 2018 with case docket number 18-mv-80132-JSC,  in support of Palantir's application seeking to take Section 1782 discovery of Abramowitz.

5.    Palantir has submitted evidence obtained through the Section 1782 application brought before the Northern District of California in the German Proceeding, and the German Court has accepted that evidence.

6.    I understand that Palantir is seeking an Order pursuant to Section 1782 to obtain limited discovery of the transcript of Palantir's deposition of Abramowitz in

October 2020 in connection with the litigation captioned <u>KT4 Partners LLC v. Palantir Technologies, Inc.</u> filed in the Superior Court of the State of Delaware on December 14, 2017 with case docket number N17c-12-212-EMD-CCLD (the **Delaware Action**) for use in the German Proceeding.

7.     I have reviewed my prior declaration dated August 10, 2018, attached as Exhibit A-1. I continue to stand by that declaration with the exception of the statement made in para. 9 of that declaration since Palantir did not bring such a second action in the German Court after all.

8.     In addition, I understand that Abramowitz's US counsel has insinuated that by seeking a transcript of Mr. Abramowitz's deposition, Palantir wants to avoid Mr. Abramowitz's live testimony in German proceedings. This is not Palantir's intention. I note that Abramowitz's US counsel has not provided any indication how Palantir could effect the insinuated substitution of Mr. Abramowitz testifying live by furnishing the transcript of his deposition from the Delaware Action. This lack of support does not surprise. The suggestion that a party could prevent testimony of a person that has been offered to testify by the other party and – as in the present case – has been summoned by the court in an evidentiary order to testify, ignores basic principles of German civil procedural law.

9.     On July 29, 2021, and August 2, 2021, the German Court issued a summons and guidance order directing Abramowitz, Palantir and their designated witnesses to appear before the court for an evidentiary hearing to be held October 21-22, 2021. Inter alia, it summoned Mr. Abramowitz to testify on the topics specified in the evidentiary order, thereby ordering to take evidence of testimony proffered by Abramowitz.

10.     German civil procedural law does not provide any basis for a party to effect a substitution of evidence where that evidence is tendered by the other party in support. Consequently, Palantir could not make the court rely on the transcript sought with the present Section 1782 subpoena instead of hearing Mr. Abramowitz's testimony as proffered by Abramowitz. However, the deposition transcript and related

exhibits nevertheless can be used for evaluating the reliability of Mr. Abramowitz's statements to the German Court, including for purposes of impeachment. Palantir will have the right to ask questions to Mr. Abramowitz during the evidentiary hearing, cf. Sections 451, 397 German Code of Civil Procedure (Zivilprozessordnung – "**ZPO**"). Furthermore, all parties will have the possibility to comment on the evidentiary hearing and the witness statements. In this context, Palantir will be allowed to refer to the transcript and related exhibits to test and question Abramowitz's reliability and the truthfulness of his statements in court.

11.     In witness hearings before German courts, I have personally used transcripts from testimony of the same witness in other – foreign – proceedings, including arbitration proceedings under the Rules of the London Court of International Arbitration, to verify the consistency of statements and to impeach witnesses.  In fact, I have done so previously also in the chamber of the Munich Court which has issued the evidentiary order and will hear the witnesses on 21-22 October 2021. I have no doubt that the German Court will allow us to use the transcript and exhibits, e.g. to challenge potential inaccuracies or inconsistencies with Mr. Abramowitz's deposition testimony.

12.     Attached hereto as Exhibit A-1 is the Declaration of Wolrad Prinz zu Waldeck und Pyrmont, submitted on August 13, 2018 in support of Palantir's Section 1782 application in Palantir Technologies, Inc. v. Abramowitz (Case No. 3:18-mc-80132-JSC), and Exhibit A-2, the complaint that Palantir filed against Mr. Abramowitz in the German Proceeding.

13.     Attached hereto as Exhibit A-3 is the German Court's summons in connection with the German Proceeding.

14.     Attached hereto as Exhibit A-4 is the German Court's guidance order in connection with the German Proceeding.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of September 2021, at Cologne

_____

Wolrad Prinz zu Waldeck und Pyrmont

# EXHIBIT A-1

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 7
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 1 of 57

1  CHRISTOPHER A. STECHER, CASB No. 215329
   christopher.stecher@kyl.com
2  KEESAL, YOUNG & LOGAN
   A Professional Corporation
3  450 Pacific Avenue
   San Francisco, California 94133
4  Telephone:    (415) 398-6000
   Facsimile:    (415) 981-0136
5
   TIMOTHY P. HARKNESS (*pro hac vice to be filed*)
6  timothy.harkness@freshfields.com
   DAVID Y. LIVSHIZ (*pro hac vice to be filed*)
7  david.livshiz@freshfields.com
   WERONIKA BUKOWSKI (*pro hac vice to be filed*)
8  weronika.bukowski@freshfields.com
   FRESHFIELDS BRUCKHAUS DERINGER US LLP
9  601 Lexington Avenue, 31st Floor
   New York, New York 10022
10 Telephone:    (212) 277-4000
   Facsimile:    (212) 277-4001
11
   *Attorneys for Applicant Palantir Technologies, Inc.*
12

**FILED**

AUG 13 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

13          **UNITED STATES DISTRICT COURT**

14          **NORTHERN DISTRICT OF CALIFORNIA**

15
                    Misc. Case No.
16         CV 18 80 132 MISC

17                              )
                                )                        JSC
18 EX PARTE APPLICATION OF PALANTIR   )
   TECHNOLOGIES, INC. FOR AN ORDER    )
19 PURSUANT TO 28 U.S.C. § 1782 TO    )   DECLARATION OF WOLRAD PRINZ ZU
   OBTAIN DISCOVERY FOR USE IN        )   WALDECK UND PYRMONT
20 FOREIGN PROCEEDINGS                )
                                      )
21                                    )
                                      )
22                                    )
                                      )
23 _____    )

24

25     I, Wolrad Prinz zu Waldeck und Pyrmont, an attorney admitted to practice in Germany, declare

26 under penalty of perjury under the laws of the United States as follows:

27     1.    I am a partner at the Düsseldorf office of the law firm Freshfields Bruckhaus Deringer.

28 I studied law at the Universities of Heidelberg and Munich and completed my *Referendariat* (legal

_____
DECLARATION OF WOLRAD PRINZ ZU WALDECK UND PYRMONT — CASE NO.

1    clerkship) in the circuit of the Munich Higher Regional Court. I have been admitted as an

2    *Rechtsanwalt* (attorney at law) to practice before the German courts since 2003.

3          2.      Before joining Freshfields, I worked at the then Max Planck Institute for Intellectual

4    Property, Competition and Tax Law in Munich (www.ip.mpg.de) and the Munich Intellectual Property

5    Law Center (MIPLC) (www.miplc.de) for more than seven years. I continue to be a faculty member

6    at the Munich Intellectual Property Law Center, where I teach European Patent Law. I am a member

7    of the Editorial Board of the Journal of Intellectual Property Law and Practice (JIPLP)

8    (http://jiplp.oxfordjournals.org/). I have frequently given presentations and authored more than 50

9    publications on intellectual property law topics, in particular patent law.

10         3.      In 2007, I completed LL.M. studies at the George Washington University Law School,

11   Washington D.C., graduating with a major in Intellectual Property Law (With Highest Honors).

12   Parallel to my LL.M. studies, I worked as a visiting scholar/judicial intern for The Honorable Randall

13   R. Rader at the U.S. Court of Appeals for the Federal Circuit.

14         4.      Freshfields represents Palantir Technologies Inc. ("Palantir" or the "Applicant"), a

15   corporation organized under the laws of Delaware, with its principal place of business at 100 Hamilton

16   Avenue, Palo Alto, California, 94301, in connection with litigation Palantir has already brought and

17   will bring in the near future against Marc L. Abramowitz ("Abramowitz"), a citizen of the United

18   States who resides at 3455 Washington Street, San Francisco, CA 94118, in the Regional Court

19   Munich 1 ("German Court"), in Munich, Federal Republic of Germany ("German Proceedings").

20         5.      I submit this Declaration in support of Palantir's Application for an Ex Parte Order

21   Pursuant to 28 U.S.C. § 1782 to Obtain Discovery for Use in a Foreign Proceeding (the

22   "Application"). I make this Declaration based on my own personal knowledge and based on

23   documents that I have reviewed.

24                          **BACKGROUND OF THE PARTIES' DISPUTE**

25

26         6.      As explained in detail in the complaint filed by Palantir against Abramowitz in the

27   German Proceedings ("Pending Complaint"), the dispute underlying the German Proceeding concerns

28   Abramowitz's attempt to take advantage of his position as a trusted advisor and early investor in

- 2 -

DECLARATION OF WOLRAD PRINZ ZU WALDECK UND PYRMONT — CASE NO.

1  Palantir to reap profits at Palantir's expense by patenting, in his sole name, inventions made by, and

2  belonging to, Palantir.

3       7.     As detailed in the Pending Complaint, Abramowitz was an investor in Palantir, who

4  became a respected confidant and advisor to Palantir and its senior executives.  Due to this role,

5  Abramowitz received confidential information about Palantir's business and its most sensitive

6  business strategies and trade secrets.  However, unbeknownst to Palantir and its senior management,

7  by 2014, Abramowitz sought to claim Palantir's inventions for himself.  Specifically, Abramowitz

8  filed patent applications in the United States and the European Union in his own name seeking to

9  obtain for himself inventions developed by Palantir over the course of many years of hard work (the

10  "Challenged Patents").

11       8.     On August 6, 2018, Palantir brought suit in the German Court (file no. 21 O 11054/18)

12  seeking a declaration that Abramowitz was not entitled to obtain certain patents concerning cyber

13  security and cyber insurance technologies that properly belonged to Palantir.  In addition, in the

14  German Proceeding, Palantir also seeks compensation for all damages suffered as a result of

15  Abramowitz's filing and discontinuation of the filing.  A true and correct copy of the Pending

16  Complaint and a certified English translation thereof is attached hereto as Exhibit A.

17       9.     In addition, Palantir anticipates bringing a second action in the German Court against

18  Abramowitz in the near future which will seek a declaration that Abramowitz was not entitled to

19  obtain certain patents concerning healthcare related technologies invented by Palantir.

20            **SECTION 1782 APPLICATION**

21

22       10.     I have reviewed the discovery that Palantir seeks through the 1782 Application.

23  Specifically, Palantir is requesting that Abramowitz produce documents: (1) supporting Abramowitz's

24  claim that he is an inventor of the technology covered by the Challenged Patents; (2) reflecting any

25  communication between Abramowitz, on the one hand, and Palantir, or any director, officer, or

26  employee of Palantir, on the other, concerning the technology covered by the Challenged Patents; (3)

27  concerning any effort by Abramowitz to monetize the technology covered by the Challenged Patents;

28  (4) concerning Abramowitz's knowledge of the technology covered by the Challenged Patents (5)

- 3 -

DECLARATION OF WOLRAD PRINZ ZU WALDECK UND PYRMONT — CASE NO.

1    concerning communications between Abramowitz, on the one hand, and any third party, on the other,

2    concerning the Challenged Patents or the technology underlying the Challenged Patents; and (6)

3    concerning any license granted by Palantir to Abramowitz or by Abramowitz to Palantir with respect

4    to the technology covered by the Challenged Patents.

5         11.    I believe that the discovery Palantir seeks will materially assist the German Court in

6    adjudicating the dispute between the parties.  The discovery Palantir seeks is relevant to the questions

7    of (i) inventorship of Palantir with regard to the inventions being subject of the Challenged Patents,

8    (ii) communication of inventions being subject of the Challenged Patents by Palantir to Abramowitz,

9    (iii) causality of this communication for the filing of the applications for the Challenged Patents.

10                          **AUTHORITY OF THE GERMAN COURT**

11

12        12.    Germany is a civil law country where the concept of discovery and/or document

13   production does not exist under procedural law.  Furthermore, under German law, the German Court

14   does not have authority to compel a foreign national residing and/or located outside Germany to

15   appear in a German court to provide testimony.

16        13.    Thus, the German Court cannot compel Abramowitz to produce the documents

17   requested from Palantir listed above, even though such documents are directly relevant and material to

18   the issued raised by Palantir in the German Proceeding.  The German Court can only request the

19   submission of documents particularly specified or referred by a party of the German Proceeding, and

20   does not have the authority to investigate or to order the investigation of facts or documents not

21   already specified by the parties of the action.  Furthermore, the German Court is not authorized to

22   compel a party of the German Proceeding to submit documents at all, and the documents requested are

23   out of legal reach of enforcement by the German Court.

24              **RECEPTIVITY OF THE GERMAN COURT TO EVIDENCE PROCURED**

25                    **THROUGH U.S. ASSISTANCE**

26        14.    While the German Court cannot itself order discovery through Section 1782, it will

27   nevertheless be receptive to evidence obtained through 1782 proceedings in the United States.  Under

28   German law, any documents obtained in the U.S. Application pursuant to 28 U.S.C. § 1782 can be

- 4 -

DECLARATION OF WOLRAD PRINZ ZU WALDECK UND PYRMONT — CASE NO.

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 11
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 5 of 57

1   formally introduced into the German Proceeding by offer of proof, and the German Court would –

2   without prejudice to its decision about the admission and consideration of the particular document

3   introduced according to general German rules regarding the admissibility of evidence – accept such

4   offer of such proof. Moreover any transcript of sworn testimony given under oath, such as a U.S.

5   deposition of the type required by Palantir, can be formally introduced into the German Proceeding by

6   offer of proof of document, and the German court would – without prejudice to its decision about the

7   admission and consideration of the particular document introduced as evidence according to general

8   German rules regarding the admissibility of evidence – accept such offer of proof.

9        15.     Specifically, due to the constitutional right of access to the courts according to article

10   103 para 1 of the German Basic Law, and the obligation to investigate the facts of the case to the

11   extent possible (and necessary) according to Section 286 para. 1 GCCP, German courts generally have

12   to take into consideration all evidence submitted into the proceedings (Federal Supreme Court,

13   decision of 19 June 2002, NJOZ, 2002, 2019 *et seqq*.). While there is no Federal Supreme Court

14   decision addressing the issue of Section 1782 discovery specifically, the Federal Supreme Court has

15   confirmed that the enforcement of a U.S. judgement in Germany is not precluded due to it being based

16   on evidence obtained in pre-trial discovery proceedings in the United States (Federal Supreme Court,

17   decision of 4 June 1992, NJW 1992, 3096, 3099, holding that the reliance on evidence obtained

18   through discovery does not violate German public order). This holding has been interpreted in

19   German literature as supporting the submission of evidence obtained under Section 1782 discovery

20   proceedings. Once submitted in the German proceedings, the court will then consider the documents

21   or testimony (see, e.g., *Schönknecht*, Beweisbeschaffung in den USA zur Verwendung in deutschen

22   Verfahren, GRURInt 2011, 1000, 1007 with reference to *Eschenfelder*, Verwertbarkeit von

23   Discovery-Ergebnissen in deutschen Zivilverfahren, RIW 2006, 443, 447; see also *Müller-Stoy*,

24   Grundzüge des U.S.-amerikanischen Patentverletzungsverfahrens, GRUR Int. 2005, 558, 563).

25   Furthermore, there is no law, rule of evidence, or rule of procedure in the German Proceeding that

26   prohibits a party from seeking discovery pursuant to Section 1782, and then using any evidence

27   obtained through a Section 1782 application in German court proceedings.

28

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 12
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 6 of 57

1    16.    As the German Court would accept the formal introduction of the requested documents

2  and testimony by offer of proof, the ordering of such production by a court in the United States would

3  not offend the German court or violate any order of such court.

4    17.    As explained above, German courts will accept submissions relying on evidence

5  obtained in Section 1782 proceedings and treat them as evidence in German court proceedings.  I have

6  personally submitted information and documents, such as license agreements, that were obtained

7  under discovery proceedings under 28 U.S.C. Section 1782 in several German patent infringement

8  proceedings.  In none of those cases did the court ever debate whether the evidence was admissible or

9  not.  In all cases, the court simply proceeded to take the evidence into consideration.

10

11  I declare under penalty of perjury under the laws of the United States of America that the foregoing is

12  true and correct.

13    Executed this 10th day of August 2018, at

14

15    _____
                    Wolrad Prinz zu Waldeck und Pyrmont

16

17

18

19

20

21

22

23

24

25

26

27

28

- 6 -

DECLARATION OF WOLRAD PRINZ ZU WALDECK UND PYRMONT — CASE NO.

# EXHIBIT A-2



**Freshfields Bruckhaus Deringer**

Exh... A to Declaration of Wolrad Prinz zu Waldeck und Pyrmont of 10 August 2018

Freshfields Bruckhaus Deringer LLP

*Per Kurier*
*Vorab per Telefax: +49 (0)89 5597 3003*

München
Freshfields Bruckhaus Deringer LLP
Maximiliansplatz 13
80333 München
T  +49 89 20 70 20 (Zentrale)
   +49 89 20 70 23 61 (Durchwahl)
F  +49 89 20 70 21 00
E  wolrad.waldeck@freshfields.com
   nina.bayerl@freshfields.com
www.freshfields.com

Dok. Nr.
DAC27917362
Unser Zeichen
171026-0001 WPW/NBa/MKU

Landgericht München I
- Patentrechtskammern -
Prielmayerstraße 7
80335 München

6. August 2018

### KLAGESCHRIFT

In dem Rechtsstreit

der **Palantir Technologies, Inc.**, vertreten durch ihren CEO Alex Karp, 100 Hamilton Ave, Suite 300, Palo Alto, CA 94301, Vereinigte Staaten von Amerika,

- Klägerin -

Prozessbevollmächtigte:   Alle in Deutschland zugelassenen Rechtsanwälte der Sozietät Freshfields Bruckhaus Deringer LLP, Maximiliansplatz 13, 80333 München,

g e g e n

**Marc L. Abramowitz**, 3455 Washington Street, San Francisco, CA 94118, Vereinigte Staaten von Amerika,

- Beklagte -

wegen:   Patentanmeldungen durch einen Nichtberechtigten

Streitwert (vorläufig geschätzt): € 30.000.000,-

Freshfields Bruckhaus Deringer LLP ist eine Limited Liability Partnership mit Sitz in 65 Fleet Street, London EC4Y 1HS, registriert in England und Wales unter der Registernummer OC334789. Freshfields Bruckhaus Deringer LLP ist von der Solicitors Regulation Authority zugelassen und wird von dieser reguliert. Weitere regulatorische Informationen finden Sie im Internet unter www.freshfields.com/support/legalnotice.

Eine Liste der Gesellschafter der Freshfields Bruckhaus Deringer LLP (und der Personen, die nicht Gesellschafter der LLP sind, aber ebenfalls als „Partner" bezeichnet werden) ist am Sitz der LLP erhältlich. Die Bezeichnung „Partner" bezieht sich auf einen Gesellschafter der Freshfields Bruckhaus Deringer LLP bzw. der mit ihr verbundenen Kanzleien und Gesellschaften oder auf einen ihrer Consultants oder Mitarbeiter mit vergleichbarer Position und Qualifikation.

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 15
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 9 of 57

(🏛️) **Freshfields Bruckhaus Deringer**

2|25

erheben wir namens und in Vollmacht der Klägerin Klage wegen der nichtberechtigten Anmeldung von Erfindungen der Klägerin durch den Beklagten mit der Anmeldung der EP 15851807.6 und EP 15852487.6.

Wir bitten um umgehende Zustellung der Klage und Anberaumung eines möglichst nahen Verhandlungstermins. Damit die Zustellung umgehend in die Wege geleitet werden kann, werden wir beglaubigte englischsprachige Übersetzungen dieser Klageschrift sowie Ausfertigungen der (im Original englischsprachigen) Anlagen schnellstmöglich nachreichen. Sollte die Kammer darüber hinausgehende Übersetzungen benötigen, bitten wir um umgehende Mitteilung.

Da es sich um eine patentrechtliche Streitigkeit handelt, bitten wir darum, von einer Übertragung auf einen Einzelrichter abzusehen. Eine Güteverhandlung im Sinne des § 278 Abs. 2 ZPO erscheint derzeit aussichtslos. Außerdem bitten wir darum, das schriftliche Vorverfahren anzuordnen.

**Namens und in Vollmacht der Klägerin werden wir beantragen:**

1.  Es wird festgestellt, dass der Beklagte als Nichtberechtigter durch die Anmeldung der europäischen Patente EP 15851807.6 und EP 15852487.6 (im Wege der Anmeldung der WO 2016/064919 A1 und WO 2016/065049 A1 unter Angabe der EP-Region als „designated state") Erfindungen der Klägerin angemeldet hat und der Anspruch der Erteilung dieser europäischen Patente der Klägerin zugestanden hätte.

2.  Es wird festgestellt, dass der Beklagte verpflichtet ist, der Klägerin allen Schaden zu ersetzen, der ihr durch die Anmeldung der europäischen Patente EP 15851807.6 und EP 15852487.6 (im Wege der Anmeldung der WO 2016/064919 A1 und WO 2016/065049 A1 unter Angabe der EP-Region als „designated state") als Nichtberechtigter sowie durch die Nicht-Weiterverfolgung dieser Anmeldungen mit der Folge, dass sie nunmehr als zurückgenommen gelten, entstanden ist.

3.  Es wird festgestellt, dass der Beklagte verpflichtet ist, der Klägerin allen darüber hinausgehenden Schaden zu ersetzen, der ihr dadurch entstanden ist, dass der Beklagte die WO 2016/064919 A1 und WO 2016/065049 A1 unter Angabe der Bundesrepublik Deutschland als „designated state" als Nichtberechtigter angemeldet hat und diese Anmeldungen in der Bundesrepublik Deutschland nicht weiterverfolgt hat mit der Folge, dass die Wirkung jener internationalen Anmeldungen nunmehr für die Bundesrepublik Deutschland weggefallen ist.

4.  Der Beklagte trägt die Kosten des Verfahrens.

**Ferner beantragen wir namens und in Vollmacht der Klägerin**, den Beklagten bei Vorliegen der Voraussetzungen durch Versäumnisurteil im schriftlichen Verfahren gemäß § 331 Abs. 3 ZPO zu verurteilen.

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 16
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 10 of 57
of 97

Freshfields Bruckhaus Deringer

3 | 25

## BEGRÜNDUNG

Die Klägerin begehrt eine gerichtliche Feststellung, dass der Beklagte die Patente EP 15851807.6 (im Folgenden: *EP 807*) und EP 15852487.6 (im Folgenden: *EP 487*; EP 807 und EP 487 gemeinsam im Folgenden: *Klagepatente* oder *Klagepatentanmeldungen)* zum Schutz von Erfindungen im Zusammenhang mit Schutz vor Cyber-Angriffen als Nichtberechtigter angemeldet hat, und die Klägerin die Alleinberechtigte hinsichtlich der gegenständlichen Erfindungen ist, sowie die Feststellung, dass der Beklagte zum Ersatz des entstandenen Schadens verpflichtet ist.

Ausgangspunkt dieses Rechtsstreits ist, dass der Beklagte zunächst ohne Zustimmung der allein berechtigten Klägerin die zwei internationalen Anmeldungen WO 2016/064919 A1 (im Folgenden: *WO 919*) und WO 2016/065049 A1 (im Folgenden: *WO 049*) angemeldet und hierbei als „designated states" auch Vertragsstaaten des EPÜ unter zusätzlichem Hinweis auf „European" sowie (zusätzlich separat) Deutschland aufgeführt hat, weswegen die internationalen Anmeldungen zugleich auch als EP-Anmeldungen (EP 807 und EP 487) galten. Der Beklagte hat jedoch nicht fristgemäß die Voraussetzungen für den Eintritt in die Europäische Phase beim Europäischen Patentamt (im Folgenden: *EPA*) erfüllt, weshalb die gegenständlichen Europäischen Anmeldungen EP 807 und EP 487 nunmehr als zurückgenommen gelten. Gleiches gilt im Ergebnis für die entsprechenden nationalen Anmeldungen.

Die Klägerin sieht sich daher einer Situation ausgesetzt, in welcher ein Nichtberechtigter ihre Erfindungen zu Patenten angemeldet hat, die Anmeldungen aber beim EPA und beim DPMA nicht weiter betrieben hat, sodass sie nun als zurückgenommen gelten. Entsprechend ist es der Klägerin nicht möglich, Vindikationsklagen gemäß § 8 PatG oder Art. II § 5 IntPatÜG, die die Anhängigkeit der europäischen oder nationalen Patentanmeldung voraussetzen, einzureichen.

Um nicht gänzlich ihrer als hinsichtlich der gegenständlichen Erfindungen allein Berechtigte zustehenden Rechte beraubt zu werden, möchte die Klägerin nun von der Möglichkeit Gebrauch machen, gemäß Art. 61 Abs. 1 lit. b) EPÜ neue europäische Patentanmeldungen für dieselben Erfindungen einzureichen, die gemäß Art. 61 Abs. 2 i.V.m. Art. 76 Abs. 1 EPÜ das Prioritätsrecht der beiden Klagepatente genießen werden. Hierfür bedarf es gemäß Art. 61 Abs. 1 EPÜ einer rechtskräftigen Entscheidung, mit der der Klägerin der Anspruch auf Erteilung der Klagepatente zugesprochen wird. Diese wird mit der vorliegenden Feststellungsklage begehrt.

Wir haben die Klage im Lichte der notwendigen Auslandszustellung und dem damit einhergehenden Übersetzungserfordernis bewusst knapp gehalten. Sollte das Gericht zu diesem Zeitpunkt weitere Ausführungen für erforderlich halten, bitten wir höflichst um richterlichen Hinweis gemäß § 139 ZPO.

(※) Freshfields Bruckhaus Deringer

4|25

## A.    Parteien

## I.    Die Klägerin

Die Klägerin ist ein 2004 gegründetes US-amerikanisches Software- und Dienstleistungsunternehmen, das als eines der wertvollsten privat geführten Technologie-Firmen des Silicon Valley gilt und sich auf die Analyse großer Datenmengen (Big Data) spezialisiert hat. Im Sinne dieses Gegenstandes widmet sich die Klägerin seit vielen Jahren der stetigen Entwicklung, Testung und Erfindung verschiedenster Konzepte zur Verarbeitung und Verwertung von Big Data. Ziel der Klägerin ist es, Lösungen zu schaffen, die es ihren Kunden ermöglichen, eine möglichst effiziente Analyse und Bewertung von Big Data durchzuführen und hierfür zudem eine benutzerfreundliche Oberfläche zu schaffen, sowohl auf der Ebene der Dateneinspeisung, als auch bezüglich der Wiedergabe der Auswertung.

Hierbei ist Cyber-Sicherheit einer der Kernbereiche der Klägerin, wie auch auf ihrer Website deutlich wird. Dort wird Cyber-Sicherheit unter ausdrücklichem Verweis auf die Möglichkeit der Lösung von Cyber-Problemen innerhalb einer Organisation, u.a. durch Auslesen und Bewerten von Echtzeit-Daten, als eines der Hauptthemen vorgestellt:



(abrufbar unter: https://www.palantir.com/solutions/, zuletzt abgerufen am 6. August 2018)

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 18
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 12 of 57

(W) **Freshfields Bruckhaus Deringer**

5 | 25



(abrufbar unter: https://www.palantir.com/solutions/cyber/, zuletzt abgerufen am 6. August 2018)

## II.    Der Beklagte

Der Beklagte ist ein Geschäftsmann und erfolgreicher Investor. Er ist nie als Erfinder oder Forscher aufgetreten, erst Recht nicht in den Bereichen der Datenanalyse oder Bekämpfung von Cyber-Kriminalität. Stattdessen war und ist er in den Bereichen der Immobilien und des Buyout-Investments tätig. Er verfügt über Abschlüsse in den Wirtschafts- und Rechtswissenschaften und hat keinen naturwissenschaftlichen oder technischen Ausbildungshintergrund.

Der Beklagte kontrollierte und kontrolliert verschiedene Investment-Gesellschaften (u.a. KT4 Partners LLC oder Marc Abramowitz Charitable Trust No. 2).

## III.    Verhältnis der Parteien

Der Beklagte war über die von ihm kontrollierten Investment-Gesellschaften seit 2005 ein früher Investor der Klägerin.

Im Laufe der Zeit entwickelte der Beklagte mit den Gründern, Direktoren und Mitarbeitern der Klägerin enge Beziehungen. Infolgedessen genoss er als Investor und Berater das Vertrauen der Klägerin, auch seitens einigen ihrer Gründer und leitenden Angestellten. Der Beklagte pflegte diese Vertrauensbeziehungen und trat dabei als jemand auf, dessen Interessen vollständig mit denen der Klägerin in

(W) Freshfields Bruckhaus Deringer

Einklang sind. Ebenso machte er deutlich, dass man ihm vertrauliche Informationen anvertrauen könne und er stets im besten Interesse der Klägerin handele.

Über die Jahre stand der Beklagte im regen Austausch mit der Klägerin und genoss als Investor und zuverlässiger Berater, auch auf Grundlage von entsprechenden vertraglichen Vertraulichkeitsvereinbarungen, ihr Vertrauen. In diesem Zusammenhang besuchte der Beklagte die Klägerin in den Jahren 2010 bis 2015 mehr als dreißig Mal, was er zum Anlass nahm, die Klägerin zu bitten, ihm ein Büro in ihren Geschäftsräumen in Palo Alto einzurichten.

Der Beklagte erkundigte sich regelmäßig ganz gezielt nach bestimmten Projekten der Klägerin und erfragte dabei in seiner (vermeintlichen) Rolle als Anteilseigner und zuverlässiger Berater Konzepte und Anwendungsfälle für neue Technologien. Angesichts seiner Funktion sowie den damit verbundenen Vertraulichkeitsverpflichtungen beantwortete die Klägerin gerne und umfassend die Fragen des Beklagten und versorgte ihn mit Begleitmaterial und –erläuterungen, ließ dabei aber auch keine Zweifel daran, dass es sich nicht um eine Kollaboration der Parteien handelte.

Der Beklagte hat jedoch das ihm entgegengebrachte Vertrauen systematisch missbraucht, u.a. indem er auf Grundlage von Mitteilungen der Klägerin über ihre Entwicklungen unberechtigt Patente wie die Klagepatente angemeldet hat.

## IV.    Verfahren zwischen den Parteien in den USA

In den USA sind bereits mehrere Verfahren zwischen den Parteien anhängig, die wechselseitig angestrengt wurden und Ausdruck der bestehenden Meinungsverschiedenheiten sind. Dazu zählen unter anderem die folgenden:

1.    Die Klägerin hat vor dem Superior Court of the State of California eine Klage gegen den Beklagten unter anderem wegen Verletzung der vertraglichen Vereinbarungen und Missbrauch von Geschäftsgeheimnissen der Klägerin erhoben. Ihren Klagevorwurf stützt die Klägerin auch in diesem US-amerikanischen Verfahren unter anderem auf unberechtigte Anmeldungen von US-Patenten durch den Beklagten auf Basis von als Geschäftsgeheimnisse geschützten Information, die er im Rahmen von vertraulichen Gesprächen mit der Klägerin erfahren hat.

2.    Die Klägerin hat weiterhin eine „Petition to institute derivation proceeding" gemäß 35 U.S.C. § 135 beim United States Patent and Trademark Office (im Folgenden: *USPTO*) eingereicht, dies hinsichtlich einer US-Patentanmeldung des Beklagten (US 20160112445 A1), die der Familie der hier gegenständlichen WO- bzw. EP-Anmeldungen angehört. Diese Art von Verfahren bietet Erfindern die Möglichkeit, in den USA gegen eine widerrechtliche Entnahme vorzugehen. Da das USPTO über solche Anträge in der Regel erst entscheidet, wenn das Patent erteilt wurde, was hinsichtlich US 20160112445 A1 noch nicht der Fall ist, ist eine Entscheidung in der Sache bisher nicht ergangen.

Freshfields Bruckhaus Deringer

Mit der vorliegenden Klage begehrt die Klägerin die Feststellung ihres ursprünglichen Anspruchs auf Erteilung der Klagepatente sowie die Verpflichtung zum Ersatz des durch die unberechtigte Anmeldung und das Fallenlassen der Anmeldung verursachten Schadens.

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 21
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 15 of 57

(※) Freshfields Bruckhaus Deringer

8 | 25

**B.    Klagepatentanmeldungen**

Die Klage bezieht sich auf zwei Klagepatentanmeldungen, die Erfindungen zur effizienten Erkennung, Abwehr und Prävention von Cyber-Angriffen sowie zur Risikobewertung und Bereitstellung von Versicherungen gegen Cyber-Angriffe auf Grundlage der Aus- und Verwertung von Big Data, teilweise in einem Konsortium aus mehreren Systemteilnehmern, offenbaren.

Bei den von den Klagepatentanmeldungen offenbarten Erfindungen handelt es sich um wirtschaftlich immens relevante Gegenstände. Offenbart werden umfassende Konzepte im Hinblick auf das höchst aktuelle Bedürfnis nach Schutz und Absicherung gegen Cyber-Angriffe, die wiederum zu einem immensen Schaden bei den Betroffenen führen können. 2017 hatte der Digitalverband Bitkom eine Studie veröffentlicht, gemäß welcher in den zwei Jahren zuvor 53 Prozent der deutschen Firmen Opfer von Cyber-Angriffen wurde und sich der entsprechende Schaden auf rund    55    Milliarden    Euro    jährlich    beläuft    (vgl. http://www.spiegel.de/wirtschaft/unternehmen/cyberangriffe-auf-deutsche-firmen-verursachen-milliardenschaeden-a-1158975.html, zuletzt abgerufen am 6. August 2018).

**I.    EP 807**

EP 807 basiert auf der internationalen Anmeldung WO 919 mit dem Titel „Dynamic Security rating for cyber insurance products" (in deutscher Übersetzung: „Dynamische Sicherheitsbewertung für Cyber-Versicherungsprodukte"), die am 20. Oktober 2015 unter Inanspruchnahme der Priorität der US-Patentanmeldung 62/066,716 vom 21. Oktober 2014 angemeldet wurde.

Der Beklagte gab bei der Anmeldung der WO 919 als „designated states" unter anderem unter dem Stichwort „European" die Mitgliedstaaten des EPÜ und darüber hinaus auch (separat) Deutschland an. Damit hatte die WO 919-Anmeldung gemäß Art. 11 Abs. 3 PCT i.V.m. Art. 153 Abs. 1 lit. a), Abs. 2 EPÜ zugleich die Wirkung einer EP-Anmeldung (vgl. Smielick, in: Hasselblatt, MAH Gewerblicher Rechtsschutz, 5. Auflage 2017, Internationales Patentrecht (PCT), § 40 Rn. 65) sowie einer nationalen Anmeldung in Deutschland. Entsprechend wurde der Beklagte am 3. März 2017 mit einem Schreiben vom EPA über die Voraussetzungen des Eintritts in die Europäische Phase informiert. Nachdem der Beklagte anschließend nicht reagierte, wurde er wiederholt auf die Konsequenzen der nicht erfolgten Erfüllung dieser Voraussetzungen sowie entsprechender Heilungsmöglichkeiten hingewiesen, zuletzt mit Schreiben vom 14. November 2017. Dies begründet zugleich auch den letzten Eintrag im EP-Register zu EP 807. Angesichts des Zeitablaufs ist davon auszugehen, dass die Anmeldung nunmehr als zurückgenommen gilt; jedenfalls ist die 31-Monatsfrist gemäß Art. 22 PCT abgelaufen.

Da ein Text der EP 807 nicht vorliegt, überreichen wir eine Kopie der WO 919-Patentschrift als

(seal) **Freshfields Bruckhaus Deringer**

9|25

### Anlage FBD 1

- dreifach für die Kammer -

und werden eine deutsche Übersetzung dieser Patentschrift zeitnah als **Anlage FBD 1a** nachreichen.

Auch für die Bundesrepublik Deutschland, die bei der internationalen Anmeldung als „designated state" angegeben wurde, ist die Wirkung des Art. 11 Abs. 3 PCT seit dem 21. April 2017 weggefallen. Wir legen einen Registerauszug des Deutschen Patent- und Markenamts (im Folgenden: *DPMA*) vor als

### Anlage FBD 2.

II.    **EP 487**

EP 487 basiert auf der internationalen Anmeldung WO 049 mit dem Titel „Joined and coordinated detection, handling, and prevention of cyberattacks" (in deutscher Übersetzung: „Gemeinsame und koordinierte Erkennung, Handhabung und Vorbeugung von Cyber-Angriffen"), die am 21. Oktober 2015, ebenfalls unter Inanspruchnahme der Priorität der US-Patentanmeldung 62/066,716 vom 21. Oktober 2014, angemeldet wurde.

Auch in der WO 049 sind unter „designated states" EPÜ-Vertragsstaaten unter der Überschrift „European" aufgeführt. Entsprechend wurde der Beklagte auch bezüglich dieser Anmeldung mit Schreiben vom 3. März 2017 über die Voraussetzungen für den Eintritt in die Europäische Phase informiert. Ebenso wurde der Beklagte mehrmals hinsichtlich der Konsequenzen der Nichterfüllung dieser Voraussetzungen adressiert, bevor am 9. Februar 2018 eine Schlussverfügung erging, gemäß welcher die Anmeldung gemäß Art. 153 EPÜ i.V.m. Regel 160 Abs. 1 als zurückgenommen gilt.

Wir überreichen eine Kopie der WO 049-Patentschrift als

### Anlage FBD 3

- dreifach für die Kammer -

und werden eine deutsche Übersetzung dieser Patentschrift zeitnah als **Anlage FBD 3a** nachreichen.

Für die Bundesrepublik Deutschland, die bei der internationalen Anmeldung (auch) als „designated state" angegeben wurde, ist die Wirkung des Art. 11 Abs. 3 PCT seit dem 21. April 2017 ebenfalls weggefallen. Wir legen einen Registerauszug des DPMA vor als

### Anlage FBD 4.

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 23
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 17 of 57

 Freshfields Bruckhaus Deringer

### III.    Gegenstände der Klagepatentanmeldungen

Die Klagepatentanmeldungen widmen sich ganz allgemein der Erkennung, Abwehr und Prävention von Cyber-Angriffen sowie der Risikobewertung und Bereitstellung von Versicherungen gegen Cyber-Angriffe. Die offenbarten Erfindungen zeichnen sich unter anderem durch eine Echtzeit-Abrufung, -beobachtung und -bewertung von Daten (Big Data) zu Cyber-Angriffen unter anderem zur Bereitstellung entsprechender Versicherungen aus. Darüber hinaus haben sie die Bündelung von Kräften zur Erkennung und Abwehr von Cyber-Attacken über ein Konsortium und die damit verbundene Auswertung von Daten (Big Data) zum Gegenstand.

### 1.    EP 807

Die EP 807 offenbart die Möglichkeit der dynamischen Sicherheitsbewertung für Cyber-Versicherungsprodukte zur Schaffung eines modernen Versicherungsinformationssystems. Mit diesem System soll den Besonderheiten der Cyber-Sicherheit und der mit möglichen Cyber-Attacken verbundenen Risiken Rechnung getragen werden.

Computersysteme werden für Unternehmen immer essentieller, sodass Unternehmen durch Cyber-Angriffe auf ihre Systeme erhebliche Schäden erfahren können (vgl. Absatz [0005] von EP 807, **Anlagen FBD 1/1a**). Außerdem verändert sich die Vielfalt von potenziellen Cyber-Angriffen ständig, sodass sich auch die Cyber-Sicherheitsmaßnahmen stetig anpassen müssen. Herkömmliche Versicherungen, selbst solche, die sich speziell möglichen Cyber-Angriffen widmen, berücksichtigen diese stetige Entwicklung der Cyber-Landschaft nicht hinreichend (vgl. Absatz [0005] von EP 807, **Anlagen FBD 1/1a**). Entsprechend besteht die Notwendigkeit, Cyberspace-Aktivitäten dynamisch, ständig und automatisiert zu überwachen und diese Aktivitäten im Hinblick auf ihr Risiko für versicherte (oder zu versichernde) Produkte oder Dienstleitungen zu bewerten (vgl. Absatz [0033] von EP 807, **Anlagen FBD 1/1a**). Durch diese stetige Echtzeit-Bewertung der Daten wird eine akkuratere und realistischere Risikoeinschätzung ermöglicht sowie die Möglichkeit geschaffen, dass der Versicherer seinen Versicherten schnell auf drohende Angriffe oder bestehende Sicherheitsschwachstellen hinweisen kann, wobei auch die Abstimmung individueller Versicherungsmaßnahmen und -pakete vereinfacht wird (vgl. Absatz [0033] von EP 807, **Anlagen FBD 1/1a**).

Vor diesem Hintergrund widmet sich die in EP 807 offenbarte Technologie der Ermittlung von Cyber-Versicherungspolicen und/oder -bewertungen durch die Verarbeitung von Echtzeit-Information (Big Data) in Bezug auf Cyber-Angriffe auf Datenverarbeitungsanlagen, die an ein Computernetzwerk angeschlossen sind (vgl. Absatz [0006] von EP 807, **Anlagen FBD 1/1a**). Dabei können verschiedene Aspekte wie die folgenden berücksichtigt werden: (i) Echtzeit-Daten, die auf Cyber-Angriffe hinweisen, die den Wert des Produkts oder der Dienstleistung reduzieren können, und (ii) die Berechnung einer Echtzeit-Schadensbewertung im Zusammenhang mit Verlusten hinsichtlich des Produkts oder der Dienstleistung infolge eines Cyber-Angriffs, wobei diese Schadensbewertung wiederum unter Einbeziehung z.B. der Wahrscheinlichkeit des Auftritts von Cyber-Angriffen, der

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 24
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 18 of 57
of 97

(((•))) Freshfields Bruckhaus Deringer

11|25

Wahrscheinlichkeit des Erfolgs von Cyber-Angriffen und der Schwere des Schadens an dem Produkt oder an der Dienstleistung infolge des Cyber-Angriffs erfolgt (vgl. Absatz [0007] von EP 807, **Anlagen FBD 1/1a**). Die Bewertung kann in Reaktion auf die empfangenen Echtzeit-Daten angepasst werden (vgl. Absatz [0007] von EP 807, **Anlagen FBD 1/1a**).

Die Ausführungsbeispiele konkretisieren die Möglichkeiten bei der Auswahl der Bewertungsmaßstäbe, der Bewertungsintervalle oder der Gewichtung der verschiedenen Bewertungsparameter bei der Echtzeit-Bewertung sowie die Einsatzgebiete und Kommunikation der erfolgten Bewertung. Dabei wird unter anderem die Möglichkeit der Einbeziehung von Echtzeit-Informationen über Muster von Cyber-Angriffen auf eine Vielzahl von Datennetzwerken offenbart (vgl. Abätze [0010], [0064] von EP 807, **Anlagen FBD 1/1a**). Darüber hinaus sieht EP 807 die Möglichkeit vor, dass auf Grundlage der erfolgten Bewertungen Cyber-Sicherheitsmaßnahmen oder präventive Maßnahmen empfohlen werden (vgl. z.B. Absätze [0011], [0033], [0036] von EP 807, **Anlagen FBD 1/1a**).

Für diese Bewertungsmechanismen hält EP 807 ein Verfahren (vgl. Hauptanspruch 1 und Unteransprüche 2 bis 18), ein Computerprogrammprodukt (vgl. Hauptanspruch 19 und Unteransprüche 20 bis 36), eine Vorrichtung (Ansprüche 37, 38) und ein System (Anspruch 39) bereit.

Beispielhaft geben wir nachfolgend den Verfahrensanspruch 1 wieder und verweisen im Übrigen auf die **Anlagen FBD 1/1a**:

> *"1.    A method for producing insurability ratings for a product or service, the method comprising:*
>
> *receiving, at a processor that is implemented at least in-part by electronic circuitry and coupled to a computer network, real-time data indicative of cyber-attacks that are likely to diminish a value of the product or service;*
>
> *using the processor to process the real-time data to compute a real-time damage assessment associated with losses to the product or service due to occurrence of one or more cyber-attacks, the damage assessment computed using at least a likelihood of the occurrence of the one or more cyber-attacks, a likelihood of success of the one or more cyber-attacks, and a measure of severity of damage to the product of service as a result of the occurrence of the one or more cyber-attacks; and*
>
> *using the processor to determine an insurability rating for the product or service that is usable for determination of an amount of insurance that sufficiently insures against the occurrence of the one or more cyber-attacks, wherein the insurability rating is determined at least in-part based on the real-time damage assessment and is changeable in response to changes in the received real-time data."*

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 25
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 19 of 57

Freshfields Bruckhaus Deringer

12|25

In deutscher Übersetzung:

1.   Ein Verfahren zur Ermittlung von Versicherungsratings für Waren oder Dienstleistungen, wobei das Verfahren die folgenden Schritte umfasst:

Erhalten von Echtzeitdaten, mittels eines Prozessors, der jedenfalls teilweise in eine Elektronikschaltung eingebaut und mit einem Computernetzwerk verbunden ist, die auf Cyber-Attacken schließen lassen, welche wahrscheinlich eine Reduzierung des Wertes der Ware oder der Dienstleistung verursachen werden;

Benutzen des Prozessors, um die Echtzeitdaten zu verarbeiten, um eine Schadensbewertung in Echtzeit im Zusammenhang mit Einbußen für die Ware oder Dienstleistung aufgrund des Auftretens einer oder mehrerer Cyber-Attacken zu berechnen, während die berechnete Schadensbewertung jedenfalls unter Berücksichtigung der Wahrscheinlichkeit des Auftretens der einen oder mehreren Cyber-Attacken, der Wahrscheinlichkeit des Erfolges der einen oder mehreren Cyber-Attacken und des Schadensausmaßes für die Ware oder Dienstleistung als Ergebnis des Auftretens der einen oder mehreren Cyber-Attacken erfolgt; und

Benutzen des Prozessors, um eine Ermittlung eines Versicherungsratings für die Ware oder Dienstleistung zu bestimmen, die verwendbar für die Bestimmung der Versicherungssumme ist, die hinreichend gegen das Auftreten von einer oder mehreren Cyber-Attacken versichert, wobei das Versicherungsrating jedenfalls teilweise basierend auf der Schadensbewertung in Echtzeit bestimmt wird und an Veränderungen in den erhaltenen Echtzeitdaten angepasst werden kann.

**2.      EP 487**

EP 487 knüpft an dem Bedürfnis nach einer effizienten Bekämpfung von Cyber-Angriffen und nach einem Austausch von Cyber-Information an. Es hat, zusätzlich zu dem Gegenstand von EP 807, der auch in EP 487 offenbart ist (vgl. Absätze [0030] bis [0082] von EP 487, **Anlagen FBD 3/3a**), ein System zur gemeinsamen und koordinierten Erkennung, Handhabung und Prävention von Cyber-Angriffen zum Gegenstand.

Gemäß diesem arbeitsteiligen Datenverarbeitungsansatz stellt eine zentrale Überwachungsstelle einer Überwachungsfirma einen Cyber-Angriff fest, der auf ein System eines ihrer Kunden verübt wird. Über das offenbarte Konsortiumssystem kann die Überwachungsstelle sodann im System anweisen, dass auf den Cyber-Angriff reagiert wird oder, falls notwendig, dass zusätzliche Information oder Ressourcen bereitgestellt werden. Darüber hinaus versendet die zentrale Überwachungsstelle Updates zu erkannten Cyber-Angriffen an alle Stationen in

Freshfields Bruckhaus Deringer

13 | 25

ihrem System, was wiederum die Möglichkeit der Erkennung und Prävention von Cyber-Angriffen verbessert. Schließlich ermöglicht das System, dass die zentrale Überwachungsstelle die Bekämpfung von Cyber-Attacken unter Rückgriff auf Ressourcen von allen Konsortiumsteilnehmern koordinieren kann (vgl. Absatz [0007] von EP 487, **Anlagen FBD 3/3a**). Im Mittelpunkt stehen der Austausch sowie die Auswertung von großen, von den einzelnen Konsortiumteilnehmern generierten Datenmengen. Dabei widmet sich EP 487 auch der Berücksichtigung von Bedürfnissen – wie Geheimhaltungsinteressen – der Konsortiumsteilnehmer beim Austausch der Daten (vgl. z.B. Absätze [0124], [0138], [0101] von EP 487, **Anlagen FBD 3/3a**). Durch die Kombination und Koordination des Einsatzes und der Ressourcen mehrerer Teilnehmer kann ein Abwehrsystem gegen Cyber-Angriffe bereitgehalten werden, welches in dieser Stärke nicht von einem einzelnen Überwachungssystem geleistet werden könnte (vgl. Absatz [0008] von EP 487, **Anlagen FBD 3/3a**).

Für dieses Konsortiumssystem hält EP 487 eine Vorrichtung in Form einer zentralen Überwachungsstation in einem Überwachungssystem (vgl. Hauptanspruch 1 und Unteransprüche 2 bis 11), ein Verfahren (vgl. Hauptanspruch 12 und Unteransprüche 13 bis 22) und eine Vorrichtung in Form eines Computerprogrammprodukts (vgl. Anspruch 23) bereit.

Beispielhaft geben wir nachfolgend Anspruch 1 wieder und verweisen im Übrigen auf die **Anlagen FBD 3/3a**:

> *"1.    A central monitoring station of a monitoring system for detecting and handling cyberattacks to client systems with a management system that manages a consortium of monitoring systems, comprising:*
>
> *a network interface configured to receive and transmit information using a computer network; and*
>
> *a processor and a memory comprising processor executable instructions, the processor executable instructions upon execution by the processor, configuring a plurality of components of the central monitoring station to detect and respond to cyberattacks to client systems, the plurality of components including:*
>
> *a registering component configured to register the central monitoring station with the management system as a member of the consortium of the monitoring systems;*
>
> *a detecting component configured to detect a cyberattack to a client computer system;*
>
> *a handling component configured to respond to the cyberattack;*
>
> *a reporting component configured to send an update to the management system on detecting or responding to the cyberattack for*

(W) Freshfields Bruckhaus Deringer

14|25

*sharing by other members of the consortium of monitoring systems; and*

*an updating component configured to receive data from the management system on detecting and handling a cyberattack created by the management system and other members, wherein each of the monitoring systems comprises one or more central monitoring stations, each of the central monitoring stations associated with one or more specialists with access the client computer systems,*

*wherein at least one of the monitoring systems comprises one or more local handling stations, wherein the central monitoring stations and local handling stations in each of the monitoring systems are interconnected with a distinct local network connection."*

In deutscher Übersetzung:

1.      *Eine zentrale Überwachungsstation eines Überwachungssystems zum Aufspüren und Bewältigen von Cyber-Attacken auf Kundensysteme mit einem Verwaltungssystem, das ein Konsortium von Überwachungssystemen verwaltet, bestehend aus:*

*einer Netzwerkschnittelle, eingerichtet, um mittels eines Computernetzwerks Informationen zu empfangen und zu übermitteln; und*

*einem Prozessor und einem Speicher, der von dem Prozessor ausführbare Steuerungsbefehle enthält, die von dem Prozessor ausführbaren Steuerungsbefehle bei Ausführung durch den Prozessor, eine Vielzahl von Bestandteilen der zentralen Überwachungsstation konfigurierend zum Aufspüren und Reagieren auf Cyber-Angriffe auf Kundensysteme, die Vielzahl von Komponenten umfassend:*

*einen registrierenden Bestandteil, konfiguriert, um die zentrale Überwachungsstation mit dem Verwaltungssystem als ein Mitglied des Konsortiums des Überwachungssystems zu registrieren;*

*einen ermittelnden Bestandteil, konfiguriert, um Cyber-Attacken gegen das Computersystem eines Kunden-Computersystems zu ermitteln;*

*einen bedienenden Bestandteil, konfiguriert, um auf Cyber-Attacken zu reagieren;*

*eine berichtende Bestandteil, konfiguriert, um ein Update an das Verwaltungssystem über die Ermittlung oder die Reaktion auf Cyber-Attacken zu senden, um dies mit anderen Mitgliedern des Konsortiums des Überwachungssystems zu teilen; und*

(logo) Freshfields Bruckhaus Deringer

15|25

> *eine aktualisierende Komponente, konfiguriert, um Daten von dem Überwachungssystem über die Ermittlung und Reaktion auf Cyber-Attacken, die von dem Verwaltungssystem und anderen Mitgliedern erstellt werden, zu empfangen, wobei jedes der Überwachungssysteme eine oder mehrere zentrale Überwachungsstationen enthält, und jede der zentralen Überwachungsstationen mit einem oder mehreren Spezialisten mit Zugriff auf das Computersystem des Versicherungsnehmers verbunden ist,*

> *wobei jedenfalls eines der Überwachungssysteme eine oder mehrere lokale Handlungsstationen enthält, wobei die zentralen Überwachungsstationen und die lokalen Handlungsstationen in jedem der Überwachungssysteme mit einer bestimmten lokalen Netzwerkverbindung vernetzt sind.*

Die Wiedergabe der Ansprüche 1 der Klagepatentanmeldungen erfolgt vor dem Hintergrund, dass die Gesamtoffenbarung der Anmeldungen maßgeblich ist, nur beispielhaft.

(ⓦ) Freshfields Bruckhaus Deringer

16|25

**C.    Erfindungen der Klägerin und entsprechende Mitteilungen an den Beklagten**

Der Beklagte hat die Erfindungen, die Gegenstand der Anmeldungen EP 487 und
EP 807 sind, als Nichtberechtigter zum Patent angemeldet. Berechtigt ist stattdessen
allein die Klägerin, deren Mitarbeiter jene Erfindungen getätigt (hierzu **unter I.**) und
dem Beklagten auch mitgeteilt haben (hierzu **unter II.**). Einzig aufgrund dieser
Mitteilungen hat der Beklagte die Erfindungen sodann zu den Klagepatenten
angemeldet (hierzu **unter III.**).

**I.    Erfindungsbesitz der Klägerin**

Die von den Klagepatentanmeldungen offenbarten Gegenstände sind allesamt auf
Erfindungen der Klägerin zurückzuführen.

Seit Anfang 2013 widmete sich ein Team von Ingenieuren bei der Klägerin (im
Folgenden: *Projektteam*) verstärkt einem Projekt, das zum Ziel hatte, Systeme und
Verfahren zur besseren Verteidigung von Unternehmen gegen Cyber-Angriffe auf
ihre Netzwerke zu entwickeln.

Ein Aspekt dieses Projekts war die Möglichkeit, Daten bezüglich Cyber-Angriffen
zwischen verschiedenen Teilnehmern eines Überwachungssystems auszutauschen,
um sich auf diese Weise effizienter gegen Cyber-Angriffe zu wehren und zudem
Cyber-Angriffe bereits präventiv zu verhindern. Dieser Aspekt wird intern auch als
„CyberMesh" oder „Cyber Mesh" bezeichnet, also als Cyber-Geflecht oder Cyber-
Netz. Beispielhaft legen wir eine Zusammenfassung der CyberMesh-Erfindungen der
Mitarbeiter der Klägerin mit dem Titel „The Palantir Cyber Mesh – Share,
collaborate, defend" (in deutscher Übersetzung: „Das Palantir Cyber-Netz – teilen,
zusammenarbeiten, verteidigen") vor als

**Anlage FBD 5.**

Eine deutsche Übersetzung werden wir zeitnah als **Anlage FBD 5a** nachreichen.

In dieser Zeit widmete sich das Projektteam zudem dem Bedürfnis nach der
Verbesserung von verwandten Cyber-Versicherungssystemen. Die Klägerin erkannte
die Schwierigkeiten für Unternehmen, effiziente und angemessene Versicherungen
gegen Cyber-Angriffe zu erhalten, auch weil es den Versicherungsunternehmen nicht
möglich ist, die richtigen Versicherungskonzepte und Prämien zu ermitteln.
Entsprechend widmete sich das Projektteam der Entwicklung eines Systems, mit
welchem eine möglichst genaue Bestimmung des Cyber-Angriffsrisikos möglich ist.
Die Klägerin wollte hierfür die Fähigkeiten nutzen, Daten der Kunden auslesen und
in Echtzeit verstehen zu können. Ausgangspunkt war außerdem auch die auf
CyberMesh basierende Überlegung, dass man unter anderem mit den im System
ausgelesenen und ausgetauschten Echtzeit-Informationen zu Cyber-Angriffen auch
entsprechende Versicherungssysteme verbessern könne.

Das Projektteam setzte sich zusammen aus

(W) Freshfields Bruckhaus Deringer

17|25

    – Shyam Sankar (Ingenieur, Direktor),

    – Jacob Albertson (Ingenieur, intern bezeichnet als „Forward Deployed Engineer"),

    – Melody Hildebrandt (Entwicklungsspezialistin, Head of Cyber Security Offering),

    – Harkirat Singh (Ingenieur, intern bezeichnet als „Forward Deployed Engineer"),

    – Rick Ducott (Ingenieur, intern bezeichnet als „Forward Deployed Engineer"),

    – Peter Maag (Ingenieur, intern bezeichnet als „Forward Deployed Engineer"), und

    – Marissa Kimball („deployment specialist").

Abgesehen von Harkirat Singh sind alle Projektteamteilnehmer auch jetzt noch bei der Klägerin angestellt. Auch Harkirat Singh war ursprünglich und auch während des hier relevanten Zeitraums der Erfindungen bei der Klägerin angestellt, ist nun aber bei ihrer Tochter, der Palantir Technologies UK Ltd. beschäftigt.

Das Projektteam dokumentierte die Entwicklung und den Fortschritt jener Systeme. Bereits im September 2013 notierte Shyam Sankar intern die Beachtlichkeit der Entwicklungen. Entsprechend setzte sich das Projektteam auch schon im Oktober 2013 mit Patentanwälten zusammen, um die Möglichkeiten des Schutzes jener Fortschritte zu besprechen. Es folgte ein weiterer Austausch von Teilnehmern des Projektteams mit Patentanwältin im Zeitraum Oktober 2013 bis Mai 2014 bezüglich der Erfindungen der Klägerin.

Die Gegenstände der Klagepatentanmeldungen wurden sowohl hinsichtlich ihrer Kerngedanken als auch in ihren Einzelheiten allein von dem Projektteam der Klägerin erarbeitet. Insbesondere entwickelte das Projektteam

    • die Bewertung des Risikos von Cyber-Angriffen auf Basis der Auswertung von Echtzeit-Informationen, insbesondere in Kollaborationssystemen, zu Präventions- und Versicherungszwecken,

    • die gemeinsame und koordinierte Erkennung, Handhabung und Prävention von Cyber-Angriffen über ein zentrales Überwachungssystem, und

    • die entsprechende Implementierung in Computer- und Netzwerksysteme, Hardware und Software.

Alle Projektteilnehmer haben ihre Rechte an den gegenständlichen Erfindungen an die Klägerin übertragen.

(logo) Freshfields Bruckhaus Deringer

18|25

## II.    Mitteilung der offenbarten Erfindungen an den Beklagten

Mitarbeiter des Projektteams der Klägerin haben ihre Entwicklungen zu CyberMesh und Cyber-Versicherungssystemen, die später Gegenstand der Klagepatentanmeldungen wurden, umfassend mit dem Beklagten geteilt.

1.    Konkret erwähnten Mitarbeiter bzw. Direktoren der Klägerin diese Projektentwicklungen spätestens im Juni 2014, als Kevin Kawasaki, Leiter Business Development bei der Klägerin im Rahmen eines Gesprächs mit dem Beklagten darauf hinwies, dass die Klägerin momentan unter anderem an Entwicklungen im Bereich von Cyber-Sicherheit und Cyber-Versicherungen arbeite. Nachdem der Beklagte sein Interesse an diesen Themen zum Ausdruck brachte, stellte Kevin Kawasaki den Kontakt zwischen dem Beklagten und einem Mitglied des Projektteams, Shyam Sankar, her.

2.    Mit einer E-Mail vom 9. Juni 2014 übersandte Shyam Sankar erste Informationen zu den jüngsten Entwicklungen des Projektteams an den Beklagten und schlug zudem ein Treffen vor, um diese Entwicklungen im Detail zu besprechen. Wir legen die E-Mail-Korrespondenz (teilweise geschwärzt) in Kopie vor als

### Anlagen FBD 6

und werden eine deutsche Übersetzung zeitnah als **Anlage FBD 6a** nachreichen.

Im Wortlaut hieß es in der ersten E-Mail vom 9. Juni 2014 von Shyam Sankar an den Beklagten u.a.:

> *„Marc, do you want to get together to explore some of the ideas we are cooking up? Kiahna can help us schedule time in Palo Alto.*
>
> *Here are my previously synthesized thoughts:*
>
> *Cyber Insurance. Most people are modeling cyber insurance as some sort of liability insurance. I think cyber is substantially more sophisticated (presents greater opportunities).* ***We are exploring launching our own cyber insurance business (in partnership with a traditional insurer) that takes a more active role. We'd actually deploy probes and sensors onto the networks of all our customers, actively monitoring in real time not only for attacks but also signs of weakness.*** *We'd be prescriptive on the minimum bar of protection (quarterly new requirements that we'd be happy to implement for the customer or they can do themselves – otherwise the insurance lapses) – necessary for such a fast moving threat. We'd have network effects:* ***because we can see what's happening at customer A-M, we can more rapidly defend and harden customers N-Z.***
>
> ***There is a tremendous amount of operational know how needed here on both the cyber end and the insurance end. We feel confident about what we can do on the cyber end (we just thwarted another attempt by the Iranian***

⟨⟨⟩⟩ Freshfields Bruckhaus Deringer

19|25

> *Intelligence to get inside Palantir — using a sophisticated, brand new zero day exploit). But we need to partner with an entrepreneurial insurance or reinsurance company.*

> *The alpha here comes from the fact that our approach to cyber is actually rather different than (maybe even heretical to) the mainstream. Everyone else is looking for a magic answer. We know where the application of force and hard work builds a defensive position. Cyber isn't about a single silver bullet— it is about getting 1000 lead bullets to land correctly."*

(**Anlage FBD 6**, S. 3 f., Hervorhebung diesseits)

In deutscher Übersetzung:

> *Marc, möchtest du dich mit uns zusammensetzen, um einigen der Ideen nachzugehen, die wir aushecken? Kiahna kann uns helfen, Zeit dafür in Palo Alto zu finden.*

> *Hier sind meine vorab gebildeten Gedanken:*

> *Cyber Versicherung. Viele Leute gestalten Cyber Versicherungen als eine Art Haftpflichtversicherung. Ich denke, Cyber ist deutlich ausgeklügelter (bietet größere Möglichkeiten).* **Wir gehen den Weg, unser eigenes Cyber-Versicherungsgeschäft zu eröffnen (in Zusammenarbeit mit einem traditionellen Versicherer), das eine aktivere Rolle übernimmt. Wir stellen eigentlich Sonden und Sensoren auf den Netzwerken aller unserer Kunden bereit, die aktiv in Echtzeit nicht nur Attacken, sondern auch Schwachstellen überwachen.** *Wir wären hinsichtlich eines Mindestmaßes an Schutz verbindlich (quartalsweise neue Anforderungen, die wir gerne für den Kunden umsetzen oder die er selbst umsetzen kann – andernfalls würde die Versicherung erlöschen) – notwendig für eine so schnelllebige Bedrohung. Wir würden Netzwerkeffekte haben:* **Da wir sehen können, was bei den Kunden A-M vor sich geht, können wir die Kunden N-Z schneller verteidigen und abhärten.**

> **Es wird eine ungeheure Menge von operativem Know-how sowohl auf Cyber-Seite als auch auf Versicherungs-Seite benötigt. Wir sind zuversichtlich hinsichtlich dessen, was wir auf Cyber-Seite tun können** *(wir haben gerade einen anderen Versuch des Iranischen Geheimdienstes, bei Palantir hereinzukommen, verhindert – benutzt wurde eine komplexe, brandneue Zero-Day-Attacke). Wir müssen uns aber mit einer betrieblichen Versicherung oder eine Rückversicherungsgesellschaft zusammentun.*

> *Das Alpha rührt daher, dass unser Ansatz bei Cyber sich tatsächlich ziemlich (vielleicht sogar häretisch) von der breiten Masse unterscheidet. Alle anderen suchen nach einem Wundermittel. Wir wissen, wo der Einsatz von Kraft und harter Arbeit eine defensive Position erschafft. Bei Cyber geht es nicht um ein*

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 33
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 27 of 57

(Ⓦ) Freshfields Bruckhaus Deringer

20|25

> *Allheilmittel – es geht darum zu erreichen, dass 1000 Bleikugeln richtig treffen.*

(**Anlage FBD 6a**, S. 3 f., Hervorhebung diesseits)

3.  Einen Tag später, am 10. Juni 2014, kam es zu einem Treffen zwischen dem Beklagten und Shyam Sankar im Hauptquartier der Klägerin. Während dieses Treffens erläuterte Shyam Sankar die Einzelheiten der Entwicklungen seines Projektteams zu Cyber Mesh und der Cyber-Versicherung, und dabei auch sämtliche Aspekte, die später durch den Beklagten in die Klagepatentanmeldungen eingeführt wurden. Insbesondere beschrieb Shyam Sankar das von der Klägerin entwickelte Cyber-Versicherungskonzept, das die Technologie der Klägerin, also insbesondere die Möglichkeit der Echtzeit-Abfrage und –Auswertung von Information, nutzt, um die Bereitstellung von passenden Produkten zum Schutz der Kunden gegen Cyber-Angriffe durch Versicherungen zu verbessern. Ebenso erläuterte Shyam Sankar für den Beklagten das Cyber Mesh-Projekt, das sich unter anderem durch die Idee auszeichnete, dass mehrere Beteiligte (wie Kunden) gemeinsam ein Konsortium gründen, um Informationen über Cyber-Angriffe untereinander zu teilen, sich gemeinsam gegen Cyber-Angriffe zu wehren und Verteidigungsmöglichkeiten für die Zukunft zu entwickeln und zu verbessern.

4.  Im Anschluss an das Treffen verschickte Shyam Sankar noch am selben Abend intern eine E-Mail, die wir (teilweise geschwärzt) in Kopie als

**Anlagen FBD 7**

vorlegen. Eine deutsche Übersetzung werden wir zeitnah als **Anlage FBD 7a** nachreichen.

In dieser E-Mail berichtete Shyam Sankar u.a. darüber, dass der Beklagte im Bereich der Cyber-Versicherung mit der Klägerin zusammenarbeiten wolle:

> *„[…] When I met him about insurance he wanted to head it up. Fixated on starting a subsidiary. Or building a building and leasing it back to Palantir. […]"*

(**Anlage FBD 7**, S. 1)

In deutscher Übersetzung:

> *[…] Als ich ihn bezüglich der Versicherung traf, wollte er sie leiten. Fixiert darauf, eine Tochtergesellschaft zu gründen. Oder eine Gebäude zu errichten und an Palantir zurückzuvermieten. […]*

(**Anlage FBD 7a**, S. 1)

Wie der Antwort von Kevin Kawasaki vom 12. Juni 2014 zu entnehmen ist (ebenfalls Bestandteil der **Anlagen FBD 7/7a**), entschied die Klägerin, dem Beklagten nicht zu gestatten, eine Cyber-Versicherungstochter zu leiten.

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 34
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 28 of 57

(※) Freshfields Bruckhaus Deringer

21|25

5.    Nur kurze Zeit später, im Oktober 2014, reichte der Beklagte auf Grundlage der
Mitteilungen seitens der Mitarbeiter der Klägerin die provisorische US-
Patentanmeldung 62/066,716 ein, deren Priorität die Klagepatentanmeldungen in
Anspruch nehmen. Dennoch brachte der Beklagte gegenüber der Klägerin weiterhin
jedenfalls bis Februar 2015 sein Interesse am Cyber-Versicherungsgeschäft durch
entsprechende Anfragen zum Ausdruck. Diese Anfragen wurden gestellt, lange
nachdem der Beklagte heimlich und ohne die Klägerin zu informieren jene
Klagepatentanmeldungen eingereicht hatte, und verdeutlichen entsprechend die
fortlaufende Täuschung.

Damit steht fest, dass die Klägerin die Gegenstände, die der Beklagte später zu den
Klagepatentanmeldungen angemeldet hat, nicht nur selbst entwickelt, sondern auch
dem Beklagten mitgeteilt hat.

III.    **Kausalität**

Die beschriebenen Mitteilungen der Klägerin an den Beklagten waren für die
Anmeldung der Klagepatente kausal.

1.    Bereits die als **Anlagen FBD 6/6a und FBD 7/7a** vorgelegte E-Mail-Korrespondenz
belegt, dass die Klägerin bei dem Beklagten durch ihre Mitteilungen zu Cyber Mesh
sowie den von ihr entwickelten Cyber-Versicherungssystemen Interesse an diesen
Themen geweckt und dem Beklagten erst durch die Mitteilung dieser Aspekte
überhaupt das Wissen verschafft hat, auf dessen Basis der Beklagte die Klagepatente
angemeldet hat.

Auch die inhaltliche Übereinstimmung zwischen dem, was die Mitarbeiter der
Klägerin entwickelt und dem Beklagten 2014 mitgeteilt haben, und dem, was der
Beklagte im Herbst 2014 mit der Prioritätsanmeldung angemeldet beziehungsweise
2015 zum Gegenstand der Klagepatentanmeldungen gemacht hat, belegt die
Kausalität. Gleiches gilt für den zeitlichen Zusammenhang, denn die
Prioritätsanmeldung erfolgte im Oktober 2014 und damit nur vier Monate nach den
Mitteilungen durch Shyam Sankar. Auch sämtliche Parallelanmeldungen in den USA
erfolgten im unmittelbaren zeitlichen Zusammenhang mit den Mitteilungen von
Shyam Sankar.

2.    Eine parallele Eigenerfindung des Beklagten ist bereits aufgrund der
Lebenserfahrung ausgeschlossen. Der Beklagte ist nie als Erfinder oder Entwickler in
irgendeiner technischen Disziplin in Erscheinung getreten, erst Recht nicht im
Zusammenhang mit Cyber-Security und entsprechenden Versicherungen. Er weist
auch keinerlei technische Ausbildung vor, sondern hat Wirtschafts- und
Rechtswissenschaften studiert. Er hat – anders als die Klägerin und ihre Mitarbeiter –
in den Bereichen, die Gegenstände der Klagepatentanmeldungen sind, schlicht keine
Expertise, sondern ist stattdessen in Immobilien- und Investmentgeschäfte involviert.

Case No. 1:21-mc-00188-RM   Document 1-1   filed 09/15/21   USDC Colorado   pg 35
Case 3:18-mc-80132-JSC   Document 4   Filed 08/13/18   Page 29 of 57
of 97

(⊕) Freshfields Bruckhaus Deringer

22 | 25

**D.    Rechtliche Würdigung**

Aus dem geschilderten Sachverhalt folgt, dass den Feststellungsanträgen zu 1. und 2. stattzugeben ist.

**I.    Feststellungsantrag zu 1.**

Voraussetzungen für die mit Antrag zu 1. begehrten Feststellungen sind, dass die Klägerin nachweist, dass

- eine fertige Erfindung auf Seiten der Klägerin vorliegt,

- Wesensgleichheit der Erfindung(en) der Klägerin mit den Gegenständen der Klagepatentanmeldungen besteht, und

- die Erfindung(en) der Klägerin bzw. deren Mitteilungen an den Beklagten kausal für die Klagepatentanmeldungen war(en) (vgl. Melullis, in: Benkard, PatG, 11. Aufl. 2015, § 8 Rn. 21 ff.).

Darüber hinaus bedarf es eines Feststellungsinteresses gemäß § 256 ZPO.

Die Voraussetzungen sind vorliegend erfüllt.

1.    Die Klägerin bzw. ihr Projektteam hat mit der Entwicklung der CyberMesh- und Cyber-Versicherungssysteme fertige Erfindungen geschaffen, die mit den Gegenständen der Klagepatentanmeldungen wesensgleich sind.

Wesensgleichheit setzt voraus, dass die Erfindungen der Klägerin und die Gegenstände der Klagepatentanmeldungen nach Problemstellung und Lösung übereinstimmen, die wiederum objektiv anhand der tatsächlichen Lösung der technischen Probleme zu bestimmen sind (vgl. BGH, GRUR 1981, 186, 189 – Spinnturbine II). Ebenso ist es ausreichend, wenn das Entnommene dem Durchschnittsfachmann ein allgemeines Lösungsprinzip offenbart, von dem die streitige Anmeldung nur eine ohne weiteres auffindbare konkrete Ausgestaltung darstellt (vgl. BGH, GRUR 1981, 186, 189 – Spinnturbine II). Abänderungen im Rahmen des Fachkönnens, die den Kern der Erfindung unberührt lassen, sind unschädlich.

Die Erfindungen der Klägerin und die Gegenstände der Klagepatentanmeldungen stimmen in ihren Aufgaben und Lösungen überein.

a.    Soweit das offenbarte Cyber-Versicherungssystem betroffen ist, haben sowohl die Klagepatentanmeldungen, als auch die Erfindungen der Klägerin zur Aufgabe, in Abgrenzung zu herkömmlichen Bewertungssystemen für Cyber-Versicherungen, die oftmals (nur) vorab und unter Auswertung von Daten durch Personen vorgenommen wurden, Bewertungssysteme bereitzuhalten, die dynamischer, kurzfristiger und automatisiert eine Bewertung und Anpassung ermöglichen. Diese Aufgabe wird durch die Bereitstellung von Systemen gelöst, die automatisiert Echtzeit-Daten

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 36
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 30 of 57

(✺) Freshfields Bruckhaus Deringer

23 | 25

auswerten. Auf diese Weise wird eine akkuratere und realistischere Risikoeinschätzung ermöglicht sowie die Möglichkeit geschaffen, dass der Versicherer seinen Versicherten schnell auf drohende Angriffe oder bestehende Sicherheitsschwachstellen hinweisen kann, wobei auch die Abstimmung individueller Versicherungsmaßnahmen und -pakete vereinfacht wird (für die Klagepatentanmeldungen: Absätze [0028] ff. von EP 807, **Anlagen FBD 1/1a**; Absätze [0033] ff. von EP 487, **Anlagen FBD 3/3a**; für die Erfindungen der Klägerin beispielshaft: **Anlagen FBD 5/5a und 6/6a**, S. 4). Darüber hinaus sieht EP 807 die Möglichkeit vor, dass auf Grundlage der erfolgten Bewertungen Cyber-Sicherheitsmaßnahmen oder präventive Maßnahmen empfohlen werden (vgl. z.B. Absätze [0011], [0033], [0036] von EP 807, **Anlagen FBD 1/1a**).

b.    Auch hinsichtlich des Konsortiumssystems zur effektiveren Abwehr von Cyber-Angriffen stimmen Aufgabe und Lösung in den Klagepatentanmeldungen sowie hinsichtlich der Erfindungen der Klägerin überein.

In der hier maßgeblichen Klagepatentanmeldung EP 487 (**Anlagen FBD 3/3a**) wird eine Aufgabe nicht ausdrücklich formuliert; es ergibt sich aber beispielsweise aus den Absätzen [0006] ff. und [0083] ff., dass die Aufgabe darin besteht, ein im Vergleich zu individuellen Überwachungssystemen effizienteres und stärkeres Abwehrsystem gegen Cyber-Angriffe bereitzustellen. Diese Aufgabe wird dadurch gelöst, dass die Klagepatentanmeldung EP 487das beschriebene Konsortiumsystem offenbart, bei welchem über ein zentrales Überwachungssystem Cyber-Angriffe erkannt, große Datenmengen, die von den Konsortiumsteilnehmern in diesem Zusammenhang generiert werden, unter Berücksichtigung individueller Interessen wie beispielsweise Geheimhaltungsinteressen zwischen den einzelnen Teilnehmern ausgetauscht werden und eine effektivere Abwehr sowie spätere Prävention unter Bündelung der Ressourcen der einzelnen Teilnehmer sowie der Auswertung der gesammelten Daten erfolgt. Diese Aufgabe sowie ihre Lösung entsprechen exakt den Cyber Mesh-Entwicklungen des Projektteams bei der Klägerin.

2.    Die beschriebenen Mitteilungen der Klägerin an den Beklagten waren für die Anmeldung der Klagepatente kausal. Wir verweisen auf unsere Ausführungen oben unter C.III.

3.    Schließlich ist auch ein Feststellungsinteresse im Sinne von § 256 ZPO gegeben.

Dies erfordert ein rechtliches Interesse an der alsbaldigen Feststellung, was wiederum voraussetzt, dass dem Recht oder der Rechtslage der Klägerin im Verhältnis zum Beklagten eine gegenwärtige Gefahr der Unsicherheit droht. Nötig ist ein eigenes Interesse der Klägerin, das nicht nur wirtschaftlich, wissenschaftlich, affektiv oder ideell sein darf (Foerste, in: Musielak/Voit, ZPO, 15. Aufl. 2018, § 256 Rn. 8 m.w.N.). Darüber hinaus darf es der Klägerin nicht möglich und zumutbar sein, ein Urteil zu erwirken, aus dem auch vollstreckt werden kann, sofern so dem Feststellungsinteresse genügt ist (Foerste, in: Musielak/Voit, aaO, § 256 Rn. 12).

All diese Voraussetzungen sind vorliegend erfüllt: Mit der Anmeldung der Klagepatente hat sich der Beklagte eines Rechts berühmt, das der Klägerin zusteht.

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 37
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 31 of 57

(W) Freshfields Bruckhaus Deringer

24|25

Ein rechtliches Interesse der Klägerin an der alsbaldigen Feststellung besteht im Lichte des Art. 61 Abs. 1 lit. b) EPÜ. Der Klägerin ist es nicht möglich, ihre Rechte im Wege einer (vollstreckbaren) Vindikationsklage gemäß § 8 PatG oder Art. II § 5 IntPatÜG geltend zu machen, da die Klagepatentanmeldungen nicht mehr anhängig sind. Ebenso wenig ist es ihr möglich, ihre Erfindungen selbst zum Patent anzumelden, da jene neuen Klagepatentanmeldungen später eingereicht werden würden. Sie hat jedoch die Möglichkeit, gemäß Art. 61 Abs. 1 lit. b), Abs. 2 i.V.m. Art. 76 Abs. 1 EPÜ neue europäische Patentanmeldungen für dieselben Erfindungen und unter Inanspruchnahme der Priorität der Klagepatentanmeldungen einzureichen, sobald ihr durch rechtskräftige Entscheidung der Anspruch auf Erteilung jener europäischen Patente zugesprochen wird. Dieses ist bei EP-Anmeldungen auch dann möglich, wenn diese zwischenzeitlich nicht mehr angängig sind (vgl. Entscheidung der Großen Beschwerdekammer des Europäischen Patentamts vom 13. Juni 1994, Az. G 3/92). Letzteres begehrt die Klägerin mit dieser Feststellungsklage.

**II.    Feststellungsantrag zu 2.**

Zusätzlich zu den unter D.I. genannten Voraussetzungen setzt der Feststellungsantrag zu 2. die Möglichkeit beziehungsweise Wahrscheinlichkeit künftiger Schäden voraus (Foerste, in: Musielak/Voit, 15. Aufl. 2018, § 256 Rn. 10). Auch dabei darf der Klägerin die Erhebung einer Leistungsklage nicht möglich und zumutbar sein, beispielsweise, weil eine Leistungsklage (noch) nicht bezifferbar ist, weil die Anspruchshöhe ungewiss bleibt, zum Beispiel ein Schaden sich noch in der Entwicklung befindet (Foerste, in: Musielak/Voit, 15. Aufl. 2018, § 256 Rn. 14).

Dies ist hier gegeben. Der Klägerin wird durch die Anmeldung der Klagepatente durch den Beklagten, aufgrund der Notwendigkeit dieses Verfahrens sowie durch das Anmeldeverfahren beim EPA gemäß Art. 61 Abs. 1 lit. b) EPÜ ein Schaden entstehen (Kosten für die Rechtsverfolgung, Schaden, der durch die Verzögerung der Patentanmeldung und -erteilung entsteht, etc.), der sich jedoch zum jetzigen Zeitpunkt noch nicht beziffern lässt, nicht zuletzt, da noch nicht absehbar ist, wann es schließlich zu einer Erteilung der neu eingereichten Patentanmeldungen kommen wird.

Entsprechend hat die Klägerin, auch im Interesse der Prozessökonomie, ein rechtliches Interesse, das Bestehen des entsprechenden Schadensersatzanspruches gegen den Beklagten gemäß § 823 Abs. 1 BGB wegen der Verletzung der Rechte der Klägerin an den gegenständlichen Erfindungen als sonstige Rechte (Melullis, in: Benkard, PatG, 11. Aufl. 2015, § 8 Rn. 4) schon jetzt festgestellt zu wissen.

**III.   Feststellungsantrag zu 3.**

Der Klägerin wird zudem durch die Nichtverfolgung der internationalen Anmeldungen in Deutschland ein Schaden entstehen, dessen Bezifferung noch nicht möglich ist. Denn die Höhe des Schadens hängt beispielsweise von dem Zeitpunkt und Erfolg des Art. 61 EPÜ-Vorgehens hinsichtlich der EP-Anmeldungen im Hinblick auf Deutschland ab.

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 38
of 97
Case 3:18-mc-80132-JSC   Document 4   Filed 08/13/18   Page 32 of 57

(((W))) Freshfields Bruckhaus Deringer

25|25

## IV.    Zuständigkeit

Die Zuständigkeit des Landgerichts München folgt aus Art. 1 Abs. 1, Art. 6 des Protokolls über die gerichtliche Zuständigkeit und die Anerkennung von Entscheidungen über den Anspruch auf Erteilung eines europäischen Patents (im Folgenden: *Anerkennungsprotokoll*) i.V.m. §§ 1, 32 ZPO i.V.m. §§ 23 Nr. 1, 71 Abs. 1 GVG.

Gemäß Art. 1 Abs. 1 des Anerkennungsprotokolls gilt jenes Anerkennungsprotokoll für Klagen gegen den Anmelder, mit denen der Anspruch auf Erteilung eines europäischen Patents für einen oder mehrere der in der europäischen Patentanmeldung benannten Vertragsstaaten geltend gemacht wird. Hierunter fällt auch eine Feststellungsklage wie die hiesige, mit der die Feststellung des Bestehens jener Ansprüche begehrt wird.

Da keiner der Parteien ihren beziehungsweise seinen Wohnsitz oder Sitz in einem Vertragsstaat hat, scheidet eine Zuständigkeit gemäß Art. 2 oder 3 des Anerkennungsprotokolls aus. Ebenso handelt es sich vorliegend weder um einen Rechtsstreit zwischen einem Arbeitnehmer und einem Arbeitgeber (Art. 4 des Anerkennungsprotokolls), noch gilt eine schriftliche oder eine mündliche, schriftlich bestätigte Gerichtsstandvereinbarung (Art. 5 des Anerkennungsprotokolls). Entsprechend sind gemäß Art. 6 des Anerkennungsprotokolls die Gerichte der Bundesrepublik Deutschland ausschließlich zuständig, wobei wiederum gemäß § 32 ZPO die Gerichte am Anmeldeort, also am Ort des EPA zuständig sind, also das Landgericht München.

## E.    Streitwert

Auf den erheblichen Schaden, den Unternehmen und Organisationen durch Cyber-Angriffe erleiden können, und die damit verbundene Relevanz der streitgegenständlichen Erfindungen zum Schutz gegen Cyber-Angriffe haben wir bereits hingewiesen. Entsprechend relevant ist diese Auseinandersetzung auch für die Klägerin. Im Lichte des Umstandes, dass die Streitpatente eine Laufzeit bis 2035 (gehabt) hätten, hält die Klägerin selbst unter Berücksichtigung der Feststellungsnatur der Ansprüche den Höchststreitwert von € 30.000.000,- für angemessen.

*[signature]*

Dr. Nina Bayer
(Rechtsanwältin)

## = Certified Translation from German into English =

"I, the translator, being duly sworn and appointed for the English language by the Regional Court of Nuremberg/Fuerth, am competent to translate the document, and the translation is true and accurate to the best of my abilities."

Nuremberg, this 7 August 2018

Marie-Luise PATZELT
Sworn and appointed translator for English
Humboldtstraße 154
D-90459 Nuremberg

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 40
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 34 of 57

**= Certified Translation from German into English =**

 Freshfields Bruckhaus Deringer

**Munich**
Freshfields Bruckhaus Deringer LLP
Maximiliansplatz 13
D-80333 Munich
T  +49 89 20 70 20 (Switchboard)
   +49 89 20 70 23 61 (Extension)
F  +49 89 20 70 21 00
E  wolrad.waldeck@freshfields.com
   nina.bayerl@freshfields.com
www.freshfields.com

**Doc. No.**
DAC28057606
**Our reference**
171026-0001 WPW/NBa/MKU

*Via courier*
*In advance by fax: +49 (0)89 5597 3003*


Regional Court Munich I
- Patent Law Chambers -
Prielmayerstrasse 7
80335 Munich


6 August 2018


### C O M P L A I N T

In the matter

**Palantir Technologies, Inc.**, represented by its CEO Alex Karp, 100 Hamilton Ave, Suite 300, Palo Alto, CA 94301, United States,

- Plaintiff -

Attorneys of record:    All attorneys of the law firm Freshfields Bruckhaus Deringer LLP, Maximiliansplatz 13, 80333 Munich, admitted to practice in Germany

v e r s u s

**Marc L. Abramowitz**, 3455 Washington Street, San Francisco, CA 94118, United States,

- Defendant -

in the matter of:    patent applications by a non-entitled person

Value in dispute (preliminary estimate): **€ 30'000.000.-**

Freshfields Bruckhaus Deringer LLP is a Limited Liability Partnership located at 65 Fleet Street, London EC4Y 1HS, registered in England and Wales with registration number OC334789. Freshfields Bruckhaus Deringer LLP is authorized and regulated by the Solicitors Regulation Authority. Further regulatory information can be found on the Internet at www.freshfields.com/support/legalnotice.

A list of all partners of Freshfields Bruckhaus Deringer LLP (and of persons who are not partners of LLP but are also referred to as "partners") is available at the registered office of the LLP. The term "partner" refers to one of the partners of Freshfields Bruckhaus Deringer LLP or respectively the law firms and enterprises affiliated with it or to one of its consultants or employees with a comparable position and qualification.

**= Certified Translation from German into English =**

 Freshfields Bruckhaus Deringer

2|24

On behalf and by authority of Plaintiff, we hereby file a complaint in the matter of the non-entitled filing of inventions of Plaintiff by Defendant with the filing of EP 15851807.6 and EP 15852487.6.

We request immediate service of the complaint and scheduling of the soonest possible date for a hearing. In order for service of the process to be initiated immediately, certified English translations of this complaint and copies of the (originally English) Exhibits will be submitted as soon as possible. Should the Court require further translations, we kindly ask to be advised promptly.

Since it is a patent dispute, we request that it will not be adjudicated by a judge sitting alone. A conciliation hearing within the meaning of Section 278 para. 2 of the German Code of Civil Procedure (ZPO) appears futile at this stage. We furthermore request to order preliminary proceedings conducted in writing.

**On behalf and by authority of Plaintiff, we will request:**

1.  The Court shall find that Defendant filed inventions of Plaintiff as a non-entitled person with the filing of European patents EP 15851807.6 and EP 15852487.6 (by way of the filing of WO 2016/064919 A1 and WO 2016/065049 A1, stating the EP region as a "designated state") and that Plaintiff would have been entitled to the claim for the granting of these European patents.

2.  The Court shall find that Defendant is obligated to compensate Plaintiff for all harm suffered from the filing of European patents EP 15851807.6 and EP 15852487.6 (by way of the filing of WO 2016/064919 A1 and WO 2016/065049 A1, stating the EP region as a "designated state") as a non-entitled person as well as from the discontinuance of these applications with the consequence that they are now deemed to be withdrawn.

3.  The Court shall find that Defendant is obligated to compensate Plaintiff for all harm suffered due to Defendant filing WO 2016/054919 A1 and WO 2016/065049 A1 stating the Federal Republic of Germany as a "designated state" and discontinuing these applications within Germany with the consequence that these international applications ceased to have effect for Germany.

4.  Defendant bears the burden of costs for this proceeding.

**Furthermore, on behalf and by authority of Plaintiff, we request** to issue a default judgment against Defendant in accordance with sec. 331 (3) German Code on Civil Procedure, if the prerequisites to do so are met.

## = Certified Translation from German into English =

 Freshfields Bruckhaus Deringer

3 | 24

### G R O U N D S

Plaintiff is seeking a finding by the Court that Defendant filed the patents EP 15851807.6
(hereinafter referred to as *EP 807*) and EP 15852487.6 (hereinafter referred to as *EP 487*, EP
807 and EP 487 hereinafter collectively referred to as *patents in suit* or *patent applications in
suit*) for the protection of inventions in connection with the protection against cyber attacks as
a non-entitled person, and that Plaintiff is the sole entitled party with respect to the instant
inventions. Plaintiff furthermore is seeking a finding that Defendant shall pay compensation
for the damage that occurred.

The starting point of this legal dispute is that Defendant, without the consent of the solely
entitled Plaintiff, initially filed the two international applications WO 2016/064919 A1
(hereinafter referred to as *WO 919*) and WO 2016/065049 A1 (hereinafter referred to as
*WO 049*) and also listed Contracting States to the EPC as "designated states" with an
additional reference to "European" and (separately and in addition) Germany, which is why
the international applications were simultaneously regarded as EP applications (EP 807 and
EP 487). However, Defendant failed to fulfill the conditions for entering the European phase
at the European Patent Office (hereinafter referred to as the *EPO*) within the prescribed period,
which is why the European applications EP 807 and EP 487 are now deemed to have been
withdrawn. The same ultimately applies for the corresponding national applications.

Plaintiff is therefore faced with a situation in which a non-entitled person filed patents for its
inventions, but did not continue the applications with the EPO and the GPTO (German Patent
and Trademark Office), so that they are now deemed to have been withdrawn. Accordingly,
Plaintiff is not able to file actions for vindication pursuant to Section 8 of the German Patent
Act (PatG) or Article II Section 5 of the German Law on International Patent Treaties
(IntPatÜG), which presuppose the pendency of the European or national patent application.

In order not to be completely deprived of its rights relating to the instant inventions to which
it is entitled as the sole authorized party, Plaintiff now wishes to make use of the option
provided for in Article 61(1)(b) EPC to file new European patent applications for the same
inventions which, under Article 61(2) in conjunction with Article 76(1) EPC, will enjoy the
right of priority of the two patents in suit. According to Article 61(1) EPC, this requires a final
decision granting Plaintiff the entitlement to the grant of the patents in suit. This is the purpose
of the present action for declaratory relief.

We have deliberately kept the complaint brief in light of the necessary service abroad and the
associated need for translation. If the court requires further explanations, we kindly request to
be advised by judge pursuant to Section 139 ZPO.

= Certified Translation from German into English =

---

Freshfields Bruckhaus Deringer

4|24

A.    **Parties**

I.    **Plaintiff**

Plaintiff is a U.S. software and services company founded in 2004, and is considered one of Silicon Valley's most valuable privately held technology companies, which specializes in big data analytics. With this purpose in mind, Plaintiff has been devoted for many years to the constant development, testing and invention of a wide variety of concepts for processing and exploiting big data. Plaintiff's objective is to create solutions that enable its customers to carry out the most efficient analysis and evaluation of big data possible, as well as to create a user-friendly interface for this, both at the level of the data input and with regard to the presentation of the evaluation.

In this context, cyber security is one of the core areas of Plaintiff, as is also clearly stated on its website. Cyber security is presented there as one of the key areas, with express reference to the possibility of solving cyber problems within an organization, inter alia by reading and evaluating real-time data:



(available at: https://www.palantir.com/solutions/, last accessed on 6 August 2018)

**= Certified Translation from German into English =**

Ⓦ Freshfields Bruckhaus Deringer

5 | 24



(available at: https://www.palantir.com/solutions/cyber/, last accessed on 6 August 2018)

## II.   Defendant

Defendant is a businessman and successful investor. He has no notable history as an inventor or patent innovator in the data analysis or cyber crime fields. Rather, Defendant has made most of his career in real estate and buyout investing. He possesses degrees in economics and law and possesses no scientific or technical training.

Defendant controlled and controls different investment companies (inter alia KT4 Partners LLC or Marc Abramowitz Charitable Trust No. 2).

## III.   Relationship of the parties

Defendant was, through the investment companies controlled by him, an early investor in Plaintiff's business since 2005.

Over time, Defendant established close relationships with the Plaintiff's founders, officers, and employees. As a result, he was viewed as a trusted investor and advisor by Plaintiff, including by several of its founders and senior employees. Defendant fostered these relationships of confidence and held himself out as someone whose interests were completely aligned with Plaintiff. He also made clear that he could be trusted to keep confidences and act in Plaintiff's best interests.

**= Certified Translation from German into English =**

---

 Freshfields Bruckhaus Deringer

6 | 24

Over the years, Defendant maintained a frequent exchange with Plaintiff and, as an investor and trusted advisor, enjoyed its confidence, including on the basis of corresponding contractual confidentiality agreements. In this context, Defendant visited Plaintiff more than thirty times between 2010 and 2015, which prompted him to ask Plaintiff to set up an office for him at its business premises in Palo Alto.

Defendant regularly inquired very specifically about particular projects of Plaintiff and asked about concepts and applications for new technologies in his (alleged) role as a shareholder and trusted advisor. Given his role and the associated obligations of confidentiality, Plaintiff gladly and comprehensively answered Defendant's questions and provided him with accompanying material and explanations, while Plaintiff made it clear that there was no collaboration between the parties.

However, Defendant systematically abused the trust placed in him, inter alia, by filing patents such as the patents in suit without being entitled to do so, based on communications from Plaintiff concerning its developments.

### IV.  Proceedings between the parties in the United States

There are already multiple proceedings pending between the parties in the United States that were initiated by both parties and reflect the existing disagreements. They include, inter alia:

1.  Plaintiff has filed a complaint against Defendant before the Superior Court of the State of California for breach of the contractual arrangements and theft of Plaintiff's trade secrets. In this U.S. proceeding as well, Plaintiff is basing its claim, inter alia, on non-entitled filings of U.S. patents by Defendant on the basis of information protected as trade secrets that he learned of in the context of confidential discussions with Plaintiff.

2.  Plaintiff has also filed a "Petition to institute derivative proceeding" pursuant to 35 U.S.C. § 135 with the United States Patent and Trademark Office (hereinafter referred to as the *USPTO*) in respect of a U.S. patent application of Defendant (US 20160112445 A1) that belongs to the family of the instant WO, respectively EP applications. This type of proceeding offers inventors the opportunity to take action against unlawful derivation in the United States. Since the USPTO usually decides on such applications only after the patent has been granted, which is not yet the case with regard to US 20160112445 A1, no decision has been handed down yet on the merits.

**= Certified Translation from German into English =**

 Freshfields Bruckhaus Deringer

7|24

With the present complaint, Plaintiff is seeking a finding for its original entitlement to the grant of patents in suit, and the obligation to pay compensation for the harm suffered by the non-entitled filing and by letting the filing lapse.

## B.    Patent applications in suit

The complaint relates to two patent applications in suit, which disclose inventions for the efficient detection, defense and prevention of cyber attacks as well as the risk assessment and provision of insurance against cyber attacks based on the evaluation and exploitation of big data, partly in a consortium consisting of several system participants.

The inventions disclosed by the patent applications in suit are subject matters of immense economic importance. They disclose comprehensive concepts with regard to the highly topical need for protection and safeguarding against cyber attacks, which in turn can cause immense damage to the targeted companies. In 2017, the digital association Bitkom had published a study to the effect that 53 percent of German companies had in the two previous years been victims of cyber attacks, with a damage amounting    to    approximately    55    billion    euros    per    year    (cf. http://www.spiegel.de/wirtschaft/unternehmen/cyberangriffe-auf-deutsche-firmen-verursachen-milliardenschaeden-a-1158975.html, last accessed on 6 August 2018).

## I.    EP 807

EP 807 is based on international application WO 919 entitled "Dynamic security rating for cyber insurance products," which was filed on 20 October 2015 claiming the priority of the U.S. patent application 62/066,716 of 21 October 2014.

When filing WO 919, Defendant stated, inter alia, the Member States of the EPC, and furthermore also (separately) Germany, as "designated states" under the heading "European". As a result, the WO 919 application simultaneously had the effect of an EP application pursuant to Article 11(3) PCT in conjunction with Article 153(1)(a), (2) EPC (cf. Smielick, in: Hasselblatt, MAH Gewerblicher Rechtsschutz [Industrial property law], 5th Ed. 2017, International Patent Law (PCT), Section 40, margin no. 65), and of a national application in Germany. Accordingly, Defendant was informed of the prerequisites for entering the European phase by letter from the EPO on 3 March 2017. After Defendant subsequently failed to respond, he was repeatedly reminded of the consequences of failing to satisfy these requirements and of corresponding options to cure, most recently by letter of 14 November 2017. This simultaneously forms the grounds for the last entry in the EP Register relating to EP 807. Given the passage of time, it can be assumed that the application is now deemed to have been withdrawn; in any case, the 31-month deadline according to Article 22 PCT has expired.

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 47
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 41 of 57

**= Certified Translation from German into English =**

 Freshfields Bruckhaus Deringer

8 | 24

Since no text of EP 807 is available, we submit a copy of the WO 919 specification as

### Exhibit FBD 1

- in triplicate for the Court -

and will promptly submit a translation into German of this specification as **Exhibit FBD 1a**.

For the Federal Republic of Germany as well, which was specified in the international application as a "designated state," the effect of Article 11(3) PCT has lapsed since 21 April 2017. We submit an extract from the German Federal Patent and Trademark Office (Deutsches Patent- und Markenamt, in the following: *DPMA*) register as

### Exhibit FBD 2.

**II.    EP 487**

EP 487 is based on the international application WO 049 entitled "Joined and coordinated detection, handling, and prevention of cyberattacks," which was filed on 21 October 2015, similarly claiming the priority of U.S. patent application 62/066,716 of 21 October 2014.

In WO 049 as well, the "designated states" include EPC contracting states under the heading "European." Accordingly, Defendant was also informed regarding this application of the prerequisites for entering the European phase by letter of 3 March 2017. Likewise, Defendant was repeatedly addressed with regard to the consequences of non-compliance with these prerequisites, before a final order was issued on 9 February 2018 stipulating that the application is deemed to have been withdrawn in accordance with Article 153 EPC in conjunction with Rule 160(1). We are submitting a copy of the WO 049 specification as

### Exhibit FBD 3

- in triplicate for the Court -

and will promptly submit a translation into German of this specification as **Exhibit FBD 3a**.

Case No. 1:21-mc-00188-RM     Document 1-1     filed 09/15/21     USDC Colorado     pg 48
of 97
Case 3:18-mc-80132-JSC     Document 4     Filed 08/13/18     Page 42 of 57

= Certified Translation from German into English =

 Freshfields Bruckhaus Deringer

9|24

For the Federal Republic of Germany, which was (also) specified in the international application as a "designated state," the effect of Article 11(3) PCT has similarly lapsed since 21 April 2017. We submit an extract from the DPMA register as

### Exhibit FBD 4.

## III.   Subject matters of the patent applications in suit

The patent applications in suit are concerned in general with the efficient detection, defense and prevention of cyber attacks as well as the risk-assessment and provision of insurance against cyber attacks. The disclosed inventions are distinguished, inter alia, by a real-time retrieval, monitoring and evaluation of (big) data on cyber attacks such as for the provision of respective insurances. In addition, they focus on pooling forces to detect and ward off cyber attacks via a consortium and the associated evaluation of (big) data.

## 1.   EP 807

EP 807 discloses the possibility of a dynamic security rating for cyber insurance products to provide a modern insurance information system. This system aims to do justice to the particularities of cyber security and the risks associated with potential cyber attacks.

Computer systems are becoming more and more essential for organizations, so that cyber attacks on their systems can cause significant damage to organizations (cf. paragraph [0005] of EP 807, **Exhibits FBD 1/1a**). Due to the ever-changing nature of potential cyber attacks, cyber security measures must constantly adapt. Traditional insurance policies, even those dedicated to potential cyber attacks, do not adequately address this constant evolution of the cyber landscape (cf. paragraph [0005] of EP 807, **Exhibits FBD 1/1a**). Accordingly, there is a need to monitor cyberspace activities dynamically, continuously and automatically, and to assess these activities in terms of their risk to insured (or insurable) products or services (cf. paragraph [0033] of EP 807, **Exhibits FBD 1/1a**). This continuous, real-time assessment of data allows a more accurate and realistic risk assessment to take place, as well as enables the insurer to quickly alert the insured of impending attacks or existing security vulnerabilities, while simplifying the coordination of individual insurance policies and deals (cf. paragraph [0033] of EP 807, **Exhibits FBD 1/1a**).

Against this background, the technology disclosed in EP 807 addresses the determination of cyber insurance policies and/or ratings by processing real-time information (big data) related to cyber attacks on computing assets that are coupled to a computer network (cf. paragraph [0006] of EP 807, **Exhibits FBD 1/1a**). It may take into account several aspects like (i) real-time data indicative of cyber attacks that are likely to diminish the value of the product or service, and (ii) the computation of a real-

= Certified Translation from German into English =

 Freshfields Bruckhaus Deringer

10|24

time damage assessment associated with losses to the product or service due to the occurrence of a cyber attack, which in turn involves the assessment of e.g. the likelihood of occurrence of cyber attacks, the likelihood of success of cyber attacks, and the severity of damage to the product or service as a result of the occurrence of the cyber attack (cf. paragraph [0007] of EP 807, **Exhibits FBD 1/1a**). The rating is changeable in response to the received real-time data (cf. paragraph [0007] of EP 807, **Exhibits FBD 1/1a**).

The exemplary embodiments specify the possibilities in the selection of the evaluation standards, the evaluation intervals or the weighting of the various evaluation parameters in the real-time evaluation, as well as the fields of application and communication of the completed evaluation. Among other things, the possibility of including real-time information about patterns of cyber attacks over a large number of data networks is disclosed (cf. paragraphs [0010], [0064] of EP 807, **Exhibits FBD 1/1a**). In addition, EP 807 provides for the possibility of recommending cyber security countermeasures or preventative actions based on the evaluations made (cf. for example paragraphs [0011], [0033], [0036] of EP 807, **Exhibits FBD 1/1a**).

For these evaluation mechanisms, EP 807 provides a method (cf. main claim 1 and sub-claims 2 to 18), a computer program product (cf. main claim 19 and sub-claims 20 to 36), a device (claims 37, 38) and a system (claim 39).

By way of example, we are reproducing method claim 1 below, and refer in other respects to **Exhibits FBD 1/1a**:

> *"1.    A method for producing insurability ratings for a product or service, the method*
>
> *comprising:*
>
> *receiving, at a processor that is implemented at least in-part by electronic circuitry and coupled to a computer network, real-time data indicative of cyber-attacks that are likely to diminish a value of the product or service;*
>
> *using the processor to process the real-time data to compute a real-time damage assessment associated with losses to the product or service due to occurrence of one or more cyber-attacks, the damage assessment computed using at least a likelihood of the occurrence of the one or more cyber-attacks, a likelihood of success of the one or more cyber-attacks, and a measure of severity of damage to the product of service as a result of the occurrence of the one or more cyber-attacks; and*

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 50
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 44 of 57

= Certified Translation from German into English =

 Freshfields Bruckhaus Deringer

11|24

> *using the processor to determine an insurability rating for the product or service that is usable for determination of an amount of insurance that sufficiently insures against the occurrence of the one or more cyber-attacks, wherein the insurability rating is determined at least in-part based on the real-time damage assessment and is changeable in response to changes in the received real-time data."*

German translation:

1.    *Ein Verfahren zur Ermittlung von Versicherungsratings für Waren oder Dienstleistungen, wobei das Verfahren die folgenden Schritte umfasst:*

*Erhalten von Echtzeitdaten, mittels eines Prozessors, der jedenfalls teilweise in eine Elektronikschaltung eingebaut und mit einem Computernetzwerk verbunden ist, die auf Cyber-Attacken schließen lassen, welche wahrscheinlich eine Reduzierung des Wertes der Ware oder der Dienstleistung verursachen werden;*

*Benutzen des Prozessors, um die Echtzeitdaten zu verarbeiten, um eine Schadensbewertung in Echtzeit im Zusammenhang mit Einbußen für die Ware oder Dienstleistung aufgrund des Auftretens einer oder mehrerer Cyber-Attacken zu berechnen, während die berechnete Schadensbewertung jedenfalls unter Berücksichtigung der Wahrscheinlichkeit des Auftretens der einen oder mehreren Cyber-Attacken, der Wahrscheinlichkeit des Erfolges der einen oder mehreren Cyber-Attacken und des Schadensausmaßes für die Ware oder Dienstleistung als Ergebnis des Auftretens der einen oder mehreren Cyber-Attacken erfolgt; und*

*Benutzen des Prozessors, um eine Ermittlung eines Versicherungsratings für die Ware oder Dienstleistung zu bestimmen, die verwendbar für die Bestimmung der Versicherungssumme ist, die hinreichend gegen das Auftreten von einer oder mehreren Cyber-Attacken versichert, wobei das Versicherungsrating jedenfalls teilweise basierend auf der Schadensbewertung in Echtzeit bestimmt wird und an Veränderungen in den erhaltenen Echtzeitdaten angepasst werden kann.*

2.    **EP 487**

EP 487 addresses the need for efficient cyber attack control and cyber information sharing. Its subject matter, in addition to the subject matter of EP 807 that is also disclosed in EP 487 (cf. paragraphs [0030] to [0082] of EP 487, **Exhibits FBD 3/3a**), relates to a system for the joined and coordinated detection, handling and prevention of cyber attacks.

= Certified Translation from German into English =

 Freshfields Bruckhaus Deringer

12|24

According to this distributed computing approach, a central monitoring station of a monitoring company detects a cyber attack that has been launched against a client computer system. Through the disclosed consortium system, the monitoring station can then request in the system that a response is provided to the cyber attack or, if necessary, that additional information or resources are provided. In addition, the central monitoring station sends updates on detected cyber attacks to all stations in its system, which in turn improves the ability to detect and prevent cyber attacks. Finally, the system allows the central monitoring station to coordinate the handling of cyber attacks, using resources from all of the consortium members (cf. paragraph [0007] of EP 487, **Exhibits FBD 3/3a**). The main focus is on the exchange and analysis of big volume of data generated by the consortium members. EO 487 also concerns the consideration of the consortium members' needs – like confidentiality interests – with regard to the exchange of data (cf. e.g. paragraphs [0124], [0138], [0101] of EP 487, **Exhibits FBD 3/3a**). By the combination and coordination of the efforts and resources of multiple members, a cyber defense system can be provided with stronger capabilities than any individual monitoring system (cf. paragraph [0008] of EP 487, **Exhibits FBD 3/3a**).

For this consortium system, EP 487 provides a device in the form of a central monitoring station in a monitoring system (cf. main claim 1 and sub-claims 2 to 11), a method (cf. main claim 12 and sub-claims 13 to 22), and a device in the form of a computer program product (cf. claim 23).

By way of example, we are reproducing claim 1 below, and refer in other respects to **Exhibits FBD 3/3a**:

> *"1.    A central monitoring station of a monitoring system for detecting and handling cyberattacks to client systems with a management system that manages a consortium of monitoring systems, comprising:*
>
> *a network interface configured to receive and transmit information using a computer network; and*
>
> *a processor and a memory comprising processor executable instructions, the processor executable instructions upon execution by the processor, configuring a plurality of components of the central monitoring station to detect and respond to cyberattacks to client systems, the plurality of components including:*
>
> *a registering component configured to register the central monitoring station with the management system as a member of the consortium of the monitoring systems;*

*a detecting component configured to detect a cyberattack to a client computer system;*

*a handling component configured to respond to the cyberattack;*

*a reporting component configured to send an update to the management system on detecting or responding to the cyberattack for sharing by other members of the consortium of monitoring systems; and*

*an updating component configured to receive data from the management system on detecting and handling a cyberattack created ^1by the management system and other members, wherein each of the monitoring systems comprises one or more central monitoring stations, each of the central monitoring stations associated with one or more specialists with access the client computer systems,*

*wherein at least one of the monitoring systems comprises one or more local handling stations, wherein the central monitoring stations and local handling stations in each of the monitoring systems are interconnected with a distinct local network connection."*

German translation:

*1. Eine zentrale Überwachungsstation eines Überwachungssystems zum Aufspüren und Bewältigen von Cyber-Attacken auf Kundensysteme mit einem Verwaltungssystem, das ein Konsortium von Überwachungs-systemen verwaltet, bestehend aus:*

*einer Netzwerkschnittelle, eingerichtet, um mittels eines Computer-netzwerks Informationen zu empfangen und zu übermitteln; und*

*einem Prozessor und einem Speicher, der von dem Prozessor ausführbare Steuerungsbefehle enthält, die von dem Prozessor ausführbaren Steuerungsbefehle bei Ausführung durch den Prozessor, eine Vielzahl von Bestandteilen der zentralen Überwachungsstation konfigurierend zum Aufspüren und Reagieren auf Cyber-Angriffe auf Kundensysteme, die Vielzahl von Komponenten umfassend:*

*einen registrierenden Bestandteil, konfiguriert, um die zentrale Überwachungsstation mit dem Verwaltungssystem als ein Mitglied des Konsortiums des Überwachungssystems zu registrieren;*

*einen ermittelnden Bestandteil, konfiguriert, um Cyber-Attacken gegen das Computersystem eines Kunden-Computersystems zu ermitteln;*

*einen bedienenden Bestandteil, konfiguriert, um auf Cyber-Attacken zu reagieren;*

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 53
of 97
Case 3:18-mc-80132-JSC   Document 4   Filed 08/13/18   Page 47 of 57

**= Certified Translation from German into English =**

 Freshfields Bruckhaus Deringer

14 | 24

> *eine berichtenden Bestandteil, konfiguriert, um ein Update an das Verwaltungssystem über die Ermittlung oder die Reaktion auf Cyber-Attacken zu senden, um dies mit anderen Mitgliedern des Konsortiums des Überwachungssystems zu teilen; und*

> *eine aktualisierende Komponente, konfiguriert, um Daten von dem Überwachungssystem über die Ermittlung und Reaktion auf Cyber-Attacken, die von dem Verwaltungssystem und anderen Mitgliedern erstellt werden, zu empfangen, wobei jedes der Überwachungssysteme eine oder mehrere zentrale Überwachungsstationen enthält, und jede der zentralen Überwachungsstationen mit einem oder mehreren Spezialisten mit Zugriff auf das Computersystem des Versicherungsnehmers verbunden ist,*

> *wobei jedenfalls eines der Überwachungssysteme eine oder mehrere lokale Handlungsstationen enthält, wobei die zentralen Überwachungsstationen und die lokalen Handlungsstationen in jedem der Überwachungssysteme mit einer bestimmten lokalen Netzwerkverbindung vernetzt sind.*

The references to claims 1 of the patent applications is only for exemplary purposes since the whole disclosure of the applications is relevant.

171026-0001

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 54
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 48 of 57

= Certified Translation from German into English =

(※) Freshfields Bruckhaus Deringer

15|24

### C.    Inventions of Plaintiff and corresponding communications to Defendant

Defendant has filed the inventions for a patent that are the subject matter of applications EP 487 and EP 807 as a non-entitled person. Instead, the sole entitled party is Plaintiff, whose employees made those inventions (see **I.**) and also informed Defendant (see **II.**). Only on the basis of these communications did Defendant then file the inventions for the patents in suit (see **III.**).

### I.    Plaintiff's possession of the invention

The subject matters disclosed by the patent applications in suit are all the result of Plaintiff's inventions.

Since the beginning of 2013, a team of engineers at Plaintiff (hereinafter referred to as the *project team*) has been increasingly working on a project with the aim of developing systems and methods to better defend enterprises against cyber attacks on their networks.

One aspect of this project was the ability to share data on cyber attacks between different participants in a monitoring system, in order to defend against cyber attacks more efficiently and also already avert cyber attacks in a preventive manner. This aspect is also referred to internally as "CyberMesh" or "Cyber Mesh." By way of example, we submit a summary of the CyberMesh inventions of Plaintiff's employees with the title "The Palantir Cyber Mesh – Share, collaborate, defend) as

### Exhibit FBD 5.

We will promptly submit a translation into German of this summary as **Exhibit FBD 5a.**

During this same time period, the project team also addressed the need to improve related cyber insurance systems. Plaintiff recognized the difficulties for companies to get efficient and reasonable insurances against cyber attacks, also because it is not possible for insurance companies to establish the suitable insurance concepts and insurance premiums. Therefore, the project team pursued the development of a system which enables a determination of a cyber attack risk as accurate as possible. For that, Plaintiff wanted to use the ability to access and understand customer data in real time. One starting point was also the CyberMesh-based consideration that with real-time information on cyber attacks read out and exchanged within the system, inter alia, one could also improve corresponding insurance systems.

The project team included:

171026-0001

= Certified Translation from German into English =

(※) Freshfields Bruckhaus Deringer

16|24

- Shyam Sankar (engineer, Director),

- Jacob Albertson (engineer, internal title "forward deployed engineer"),

- Melody Hildebrandt (development specialist, Head of Cyber Offering),

- Harkirat Singh (engineer, internal title "forward deployed engineer"),

- Rick Ducott (engineer, internal title "forward deployed engineer"),

- Peter Maag (engineer, internal title "forward deployed engineer") and

- Marissa Kimball ("deployment specialist").

Apart from Harkirat Singh, all project team members are still employed by Plaintiff today. Also Harkirat Singh was originally, and also during the invention period relevant here, employed by Plaintiff, but now works for Plaintiff's subsidiary, Palantir Technologies UK Ltd.

The project team documented the development and progress of these systems. As early as September 2013, one of the engineers, Shyam Sankar, noted internally the significance of the developments. Accordingly, the project team met with patent attorneys in October 2013 to discuss the possibilities of protecting these advances. This was followed by further interactions of project team members with patent attorneys in the period from October 2013 to May 2014 regarding Plaintiff's inventions.

The subject matters of the patent applications in suit were developed solely by the project team of Plaintiff, both in terms of their core ideas and in their details. In particular, the project team developed

- the assessment of the risk of cyber attacks based on the evaluation of real-time information, in particular in collaboration systems, for prevention and insurance purposes;

- the joined and coordinated detection, handling and prevention of cyber attacks via a central monitoring system, and

- the corresponding implementation in computer and network systems, hardware and software.

All of the project participants transferred their rights to the instant inventions to Plaintiff.

Case No. 1:21-mc-00188-RM     Document 1-1     filed 09/15/21     USDC Colorado     pg 56
of 97
Case 3:18-mc-80132-JSC     Document 4     Filed 08/13/18     Page 50 of 57

**= Certified Translation from German into English =**

---

(🏛) Freshfields Bruckhaus Deringer

17|24

## II.  Communication of the disclosed inventions to Defendant

Employees of Plaintiff's project team extensively communicated their developments on CyberMesh and cyber insurance systems to Defendant, which later became the subject matter of the patent applications in suit.

1.  Specifically, Plaintiff's employees or directors mentioned these project developments no later than June 2014, when Kevin Kawasaki, head of business development of Plaintiff, pointed out during a discussion with Defendant that Plaintiff was currently working, among other things, on developments in cyber security and cyber insurance. After Defendant expressed his interest in these topics, Kevin Kawasaki facilitated contact between Defendant and a member of the project team, Shyam Sankar.

2.  In an email dated 9 June 2014, Shyam Sankar sent over initial information to Defendant on the project team's most recent developments, and also proposed a meeting to discuss these developments in detail. We are submitting a copy of the email correspondence (partly redacted) as

### Exhibit FBD 6

and will promptly submit a translation into German as **Exhibit FBD 6a**.

Verbatim, the first email of 9 June 2014 by Shyam Sankar to Defendant states, inter alia:

*" Marc, do you want to get together to explore some of the ideas we are cooking up? Kiahna can help us schedule time in Palo Alto.*

*Here are my previously synthesized thoughts:*

*Cyber Insurance. Most people are modeling cyber insurance as some sort of liability insurance. I think cyber is substantially more sophisticated (presents greater opportunities).* **We are exploring launching our own cyber insurance business (in partnership with a traditional insurer) that takes a more active role. We'd actually deploy probes and sensors onto the networks of all our customers, actively monitoring in real time not only for attacks but also signs of weakness.** *We'd be prescriptive on the minimum bar of protection (quarterly new requirements that we'd be happy to implement for the customer or they can do themselves – otherwise the insurance lapses) – necessary for such a fast moving threat. We'd have network effects:* **because we can see what's happening at customer A-M, we can more rapidly defend and harden customers N-Z.**

**There is a tremendous amount of operational know how needed here on both the cyber end and the insurance end. We feel confident about what we can do on the cyber end** *(we just thwarted another attempt by the Iranian Intelligence to get inside Palantir — using a sophisticated, brand new zero day*

**= Certified Translation from German into English =**

 Freshfields Bruckhaus Deringer

18|24

*exploit). But we need to partner with an entrepreneurial insurance or reinsurance company.*

*The alpha here comes from the fact that our approach to cyber is actually rather different than (maybe even heretical to) the mainstream. Everyone else is looking for a magic answer. We know where the application of force and hard work builds a defensive position. Cyber isn't about a single silver bullet—it is about getting 1000 lead bullets to land correctly."*

**(Exhibit FBD 6**, page 3 et seq., emphasis added)

German translation:

*Marc, möchtest du dich mit uns zusammensetzen, um einigen der Ideen nachzugehen, die wir aushecken? Kiahna kann uns helfen, Zeit dafür in Palo Alto zu finden.*

*Hier sind meine vorab gebildeten Gedanken:*

*Cyber Versicherung. Viele Leute gestalten Cyber Versicherungen als eine Art Haftpflichtversicherung. Ich denke, Cyber ist deutlich ausgeklügelter (bietet größere Möglichkeiten).* **Wir gehen den Weg, unser eigenes Cyber-Versicherungsgeschäft zu eröffnen (in Zusammenarbeit mit einem traditionellen Versicherer), das eine aktivere Rolle übernimmt. Wir stellen eigentlich Sonden und Sensoren auf den Netzwerken aller unserer Kunden bereit, die aktiv in Echtzeit nicht nur Attacken, sondern auch Schwachstellen überwachen.** *Wir wären hinsichtlich eines Mindestmaßes an Schutz verbindlich (quartalsweise neue Anforderungen, die wir gerne für den Kunden umsetzen oder die er selbst umsetzen kann – andernfalls würde die Versicherung erlöschen) – notwendig für eine so schnelllebige Bedrohung. Wir würden Netzwerkeffekte haben:* **Da wir sehen können, was bei den Kunden A-M vor sich geht, können wir die Kunden N-Z schneller verteidigen und abhärten.**

**Es wird eine ungeheure Menge von operativem Know-how sowohl auf Cyber-Seite als auch auf Versicherungs-Seite benötigt. Wir sind zuversichtlich hinsichtlich dessen, was wir auf Cyber-Seite tun können** *(wir haben gerade einen anderen Versuch des Iranischen Geheimdienstes, bei Palantir hereinzukommen, verhindert – benutzt wurde eine komplexe, brandneue Zero-Day-Attacke). Wir müssen uns aber mit einer betrieblichen Versicherung oder eine Rückversicherungsgesellschaft zusammentun.*

*Das Alpha rührt daher, dass unser Ansatz bei Cyber sich tatsächlich ziemlich (vielleicht sogar häretisch) von der breiten Masse unterscheidet. Alle anderen suchen nach einem Wundermittel. Wir wissen, wo der Einsatz von Kraft und harter Arbeit eine defensive Position erschafft. Bei Cyber geht es nicht um ein Allheilmittel – es geht darum zu erreichen, dass 1000 Bleikugeln richtig treffen.*

**(Exhibit FBD 6a**, page 3 et seq., emphasis added)

= Certified Translation from German into English =

## Freshfields Bruckhaus Deringer

19|24

3.  One day later, on 10 June 2014, a meeting was held between Defendant and Shyam Sankar at Plaintiff's headquarters. During this meeting, Shyam Sankar explained the details of the developments of his product team on CyberMesh and cyber insurance, including all of the aspects later incorporated by Defendant into the patent applications in suit. In particular, Shyam Sankar described the cyber insurance concept developed by Plaintiff, which makes use of Plaintiff's technology, i.e. in particular the possibility of the retrieval and evaluation of information in real-time, in order to improve the provision of suitable products to protect customers against cyber attacks through insurance. Likewise, Shyam Sankar explained the CyberMesh project to Defendant, which was distinguished, inter alia, by the idea that several parties (such as customers) would jointly set up a consortium in order to share information about cyber attacks among themselves, jointly defend against cyber attacks, and develop and improve future defense capabilities.

4.  Following the meeting, Shyam Sankar sent an internal email that same evening, a copy of which we (partly redacted) submit as

### Exhibit FBD 7.

We will promptly submit a translation into German as **Exhibit FBD 7a**.

In this email, Shyam Sankar reported, inter alia, that Defendant wanted to cooperate with Plaintiff in the area of cyber insurance:

> *"[...] When I met him about insurance he wanted to head it up. Fixated on starting a subsidiary. Or building a building and leasing it back to Palantir."*
> *[...]*

(**Exhibit FBD 7**, page 1)

German translation:

> *[...] Als ich ihn bezüglich der Versicherung traf, wollte er sie leiten. Fixiert darauf, eine Tochtergesellschaft zu gründen. Oder eine Gebäude zu errichten und an Palantir zurückzuvermieten. [...]*

As can be seen from Kevin Kawasaki's reply of 12 June 2014 (also part of Exhibits FBD 6/6a), Plaintiff elected not to permit Defendant to head a cyber insurance subsidiary.

5.  Only a short time later, in October 2014, Defendant filed provisional U.S. patent application 62/066,716 based on the communications from Plaintiff's employees, the priority of which is claimed by the patent applications in suit. Nonetheless, Defendant continued to express interest in, and make inquiries about, Plaintiff's cyber insurance business through at least February 2015. These inquiries occurred long after Defendant had secretly filed his patent applications without telling Plaintiff and are evidence of his ongoing deception.

**= Certified Translation from German into English =**

---

(logo) Freshfields Bruckhaus Deringer

20|24

Hence, it can be established that Plaintiff not only developed the subject matters itself which Defendant subsequently filed for the patent applications in suit, but also communicated them to Defendant.

### III.     Causality

The described communications of Plaintiff to Defendant were causal for the filing of the patents in suit.

1.     The email correspondence submitted as **Exhibits FBD 6/6a and FBD 7/7a** already proves that with its communications relating to Cyber Mesh and the cyber insurance systems developed by it, Plaintiff aroused Defendant's interest in these topics, and that the knowledge forming the basis upon which Defendant filed the patent in suit was only conveyed to him in the first place by the communication of these aspects.

The causality is also proven by the substantive consistency between what Plaintiff's employees developed and communicated to Defendant in 2014 and what Defendant filed in the fall of 2014 with the priority application, respectively what he used as the subject matter of the patent applications in suit in 2015. The same applies to the temporal context, as the priority application was made in October 2014 and thus only four months after the communications by Shyam Sankar. All of the parallel applications in the United States were also made in the immediate temporal context of Shyam Sankar's communications.

2.     A parallel invention of Defendant's own can already be ruled out from a realistic standpoint. Defendant has never acted as an inventor or developer in any technical capacity, much less in connection with cyber security and corresponding insurance. He has no technical training whatsoever, but instead studied business and law. He simply has – unlike Plaintiff and its employees – no expertise in the fields that are the subject matters of the patent applications in suit, but is instead involved in real estate and investment transactions.

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 60
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 54 of 57

= Certified Translation from German into English =

(◎) Freshfields Bruckhaus Deringer

21|24

## D.    Legal assessment

It follows from the described facts of the case that motions for declaratory relief 1) and 2) are to be granted.

## I.    Motion for declaratory relief 1)

The prerequisites for the finding sought with motion 1) are that Plaintiff proves that

−    there is a finished invention on the part of Plaintiff,

−    there is consubstantiality of the invention(s) of Plaintiff with the subject matters of the patent applications in suit, and

−    the invention(s) of Plaintiff, respectively their communications to Defendant, was/were causal for the patent applications in suit (cf. Melullis, in: Benkard, PatG, 11th Ed., 2015, Section 8, margin no. 21 et seqq.).

In addition, an interest in seeking declaratory relief is required in accordance with Section 256 ZPO.

These conditions are satisfied here.

1.    With the development of the CyberMesh and cyber insurance systems, Plaintiff, respectively its project team, created finished inventions that are consubstantial with the subject matters of the patent applications in suit.

Consubstantiality presupposes that Plaintiff's inventions and the subject matters of the patent applications in suit are consistent according to the formulation of the object and solution, which in turn must be objectively determined based on the actual solution of the technical problems (cf. German Federal Court of Justice (BGH), GRUR 1981, 186, 189 − Spinnturbine II). It is also sufficient if the derived subject matter discloses a general solution principle to the person skilled in the art, of which the disputed application merely represents a concrete embodiment that can readily be discovered (cf. BGH, GRUR 1981, 186, 189 − Spinnturbine II). Modifications within the skill in the art that do not affect the core of the invention are not harmful.

Plaintiff's inventions and the subject matters of the patent applications in suit are consistent in their defined problems and respective solutions.

a.    As regards the disclosed cyber insurance system, both the patent applications in suit and the inventions of Plaintiff have the object, in derogation from conventional cyber insurance rating systems that frequently are (only) carried out in advance and by individuals analyzing provided data, of providing rating systems that allow a more dynamic, short-term and automated assessment and adjustment. This object is achieved by providing systems that automatically and continuously analyze real-time data. In this way, a more accurate and realistic risk assessment is enabled, as well as the ability

Case No. 1:21-mc-00188-RM    Document 1-1    filed 09/15/21    USDC Colorado    pg 61
of 97
Case 3:18-mc-80132-JSC    Document 4    Filed 08/13/18    Page 55 of 57

= Certified Translation from German into English =

---

(①) Freshfields Bruckhaus Deringer

22|24

for insurers to quickly alert the insured of impending attacks or existing security vulnerabilities, while simplifying the coordination of individual insurance policies and deals (for the patent applications in suit: paragraphs [0028] et seqq. of EP 807, **Exhibits FBD 1/1a**; paragraphs [0033] et seqq. of EP 487, **Exhibits FBD 3/3a**; for the inventions of Plaintiff by way of example: **Exhibits FBD 5/5a and 6/6a**, page 4). In addition, EP 807 provides for the possibility of recommending cyber security countermeasures or preventative actions based on the evaluations made (cf. for example paragraphs [0011], [0033], [0036] of EP 807, **Exhibits FBD 1/1a**).

b.    With regard to the consortium system for a more effective defense against cyber attacks as well, the object and solution in the patent applications in suit is consistent with that of the inventions of Plaintiff.

In the relevant patent application in suit EP 487 (**Exhibits FBD 3/3a**), an object is not expressly formulated; however, it is apparent, for example, from paragraphs [0006] et seqq. and [0083] et seqq. that the object is to provide a more efficient and stronger defense system against cyber attacks compared to individual monitoring systems. This object is achieved in that the patent application EP 487 discloses the described consortium system, in which cyber attacks are detected by a central monitoring system, big volume of data generated by the consortium member in this contexts is exchanged between the individual members while taken into account individual needs like confidentiality interests, and a more effective defense and subsequent prevention is achieved while pooling the resources of the individual participants and evaluating the collected data. This object and its solution correspond exactly to the Cyber Mesh developments of project team of Plaintiff.

2.    The described communications of Plaintiff to Defendant were causal for the filing of the patents in suit. We refer to our remarks above under C.III.

3.    Finally, there is also an interest in seeking declaratory relief within the meaning of Section 256 ZPO.

This requires a legal interest in an immediate finding, which, in turn, presupposes that Plaintiff's right or legal position in relation to Defendant is threatened by a present risk of uncertainty. What is necessary is Plaintiff's own interest, which may not be merely economic, scientific, affective or notional (Foerste, in: Musielak/Voit, ZPO, 15th Ed. 2018, Section 256 margin no. 8 with further references). Moreover, it may not be possible and reasonable for Plaintiff to obtain a judgment under which enforcement can also be carried out, to the extent this satisfies the interest in seeking declaratory relief (Foerste, in: Musielak/Voit, op. cit., Section 256, margin no. 12).

All of these conditions are satisfied in the case at hand: By filing the patents in suit, Defendant appropriated a right to which Plaintiff is entitled. There is a legal interest of Plaintiff in an immediate finding in light of Article 61(1)(b) EPC. Plaintiff is unable to assert its rights by means of an (enforceable) action for vindication in accordance with Section 8 PatG or Article II Section 5 IntPatÜG, since the patent applications in suit

**= Certified Translation from German into English =**

 Freshfields Bruckhaus Deringer

23|24

are no longer pending. Nor is it possible for it to apply for a patent on its inventions itself, as these new patent applications would be later filed. However, it has the option, in accordance with Article 61(1)(b), (2) in conjunction with Article 76(1) EPC to file new European patent applications for the same inventions while claiming the priority of the patent applications in suit, as soon as it is adjudged by a final decision that it is entitled to the grant of these European patents. This is possible with EP applications even if they have ceased to be pending in the meantime (cf. ruling of the enlarged board of appeal of the European Patent Office dated 13 June 1994, docket no. G 3/92). The latter is what Plaintiff is seeking with this action for declaratory relief.

**II.    Motion for declaratory relief 2)**

In addition to the prerequisites mentioned under D.I., motion for declaratory relief 2) presupposes the possibility or probability of future damage (Foerste, in: Musielak/Voit, 15th Ed. 2018, Section 256, margin no. 10). Here, too, the bringing of an action for performance may not be possible and reasonable for Plaintiff, for example, because an action for performance cannot (yet) be quantified because the claim amount remains uncertain, for example a loss is still in development (Foerste, in: Musielak/Voit, 15th Ed. 2018, Section 256 margin no. 14).

This is given here. Plaintiff will suffer harm from Defendant's filing of the patents in suit, from the need for this proceeding and the filing procedure with the EPO pursuant to Article 61(1)(b) EPC (legal costs, damage caused by the delay in filing and granting the patents, etc.), which cannot yet be quantified at the present time, also because it is not yet foreseeable when the newly filed patent applications will actually be granted.

Accordingly, Plaintiff has a legal interest, including in the interest of procedural economy, in already affirming the existence of the corresponding claim for damages against Defendant in accordance with Section 823 para. 1 of the German Civil Code (BGB) due to the infringement of Plaintiff's rights to the instant inventions as other rights (Melullis, in: Benkard , PatG, 11th Ed. 2015, Section 8 margin no. 4).

**III.    Motion for declaratory relief 3)**

Furthermore, Plaintiff will suffer harm from Defendant's discontinuance of the international applications in Germany which quantification is not yet possible. For the amount of harm depends, for example, from the point in time and the success of the procedure according to Article 61 EPC with regard to EP applications relating to Germany.

171026-0001

**= Certified Translation from German into English =**

---

Freshfields Bruckhaus Deringer

24|24

### IV. Jurisdiction

The jurisdiction of the Munich Regional Court follows from Article 1(1), Article 6 of the Protocol on Jurisdiction and the Recognition of Decisions in respect of the Right to the Grant of a European Patent (hereinafter referred to as the ***Protocol on Recognition***) in conjunction with Sections 1, 32 ZPO in conjunction with Sections 23 no. 1, 71 para. 1 of the German Judicature Act (GVG).

Pursuant to Article 1(1) of the Protocol on Recognition, the Protocol on Recognition applies for claims against the applicant asserting the right to the grant of a European patent in respect of one or more of the Contracting States designated in the European patent application. This also includes an action for declaratory relief such as the present one seeking a finding for the existence of such claims.

Since none of the parties have their residence or principal place of business within a Contracting State, jurisdiction under Article 2 or 3 of the Protocol on Recognition is excluded. Likewise, the present case is neither a dispute between an employee and an employer (Article 4 of the Protocol on Recognition), nor is there a jurisdiction agreement concluded in writing or verbally with written confirmation (Article 5 of the Protocol on Recognition). Accordingly, pursuant to Article 6 of the Protocol on Recognition, the courts of the Federal Republic of Germany have exclusive jurisdiction, whereby according to Section 32 ZPO the courts at the place of application, i.e. the place of the EPO, have jurisdiction, that is to say the Munich Regional Court.

### E. Value in dispute

We have already drawn attention to the substantial damage that companies and organizations can suffer by cyber attacks, and to the resulting relevance of the inventions in dispute as a protection against cyber attacks. The importance of the present dispute for Plaintiff is commensurate to this relevance. In view of the fact that the patents in suit would expire (would have expired) in 2035, Plaintiff itself deems the maximum value in dispute, € 30'000,000.- to be reasonable, considering the nature of the declaratory request.

Dr. Nina Bayerl
(Attorney at law)

171026-0001

# EXHIBIT A-3

# LIONBRIDGE

STATE OF NEW YORK )
)
) ss
COUNTY OF NEW YORK )

## **CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from German into English of the attached letter, dated August 2, 2021, and Order dated July 29, 2021.

Lynda Green, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this _13_ day of _September_ , 20 _21_ .

JEFFREY AARON CURETON
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CU6169789
Qualified in New York County
My Commission Expires 05-23-2023



# Munich I Regional Court

### Division for Civil Matters

<u>Munich I Regional Court 80316 Munich</u>

Attorneys at Law
Freshfields Bruckhaus Deringer LLP
Maximiliansplatz 13
80333 Munich

for inquiries:
Phone: (+49) 89 5597-2311
Fax: (+49) 89 5597-3003
Room: 620
You can reach the competent office best:
Mo-Thu: 8:00 AM-3:00 PM
and Fri: 8:00 AM-2:00 PM

| **Your reference** | **Please specify in all correspondence Case/file number** | **Date** |
|---|---|---|
| 171026-0001 WPW/NBa/MKU | 21 O 11054/18 | 8/2/2021 |

In the matter
Palantir Technologies, Inc. v. Abramowitz, M.
re. claim (EP 15851807.6; EP 15852487.6; WO 2016/064919 A1; WO 2016/065049 A1)

To whom it may concern:

In the above proceeding, the date for the taking of evidence has been scheduled for:

**Thursday, October 21, 2021 to Friday, October 22, 2021, in each case from 10:00 AM, courtroom 135, 1st floor, Prielmayerstrasse 7.**

You are herewith summoned to appear at this hearing.

The Court has moreover issued the arrangement contained in the enclosed order, which must be observed to avoid disadvantages.

Please specify the above case number in all correspondence, and please always enclose the requisite number of copies/photocopies for the counterparty(s) and other participants in the proceedings and their representative(s) with the pleadings and exhibits.

In the courthouse, access controls are being conducted, which may take some time to complete. To ensure timely presence at the hearing, please account for possible delays.

| **Street address** | **Station** | **Night deposit box** | **Communication** |
|---|---|---|---|
| Lenbachplatz 7, 80316 Munich | U-Bahn, S-Bahn: Karlsplatz station | Prielmayerstrasse 7, Pacellistrasse 5, Infanteriestrasse 5, Nymphenburger Strasse 16 | Phone: 089/5597-03 Fax: 089/5597-2991 |

Sincerely,

Hofbauer, Court Clerk
Office Registrar

**Data protection notice:**
You can find data protection information at
https://www.justiz.bayern.de/gerichte-und-behoerden/landgericht/muenchen-1/.

Certified Copy

**Munich I Regional Court**                                                    Munich, 7/29/2021

21 O 11054/18

# Order

In the matter

Palantir Technologies, Inc. v. Abramowitz, M. re. claim (EP 15851807.6; EP 15852487.6; WO 2016/064919 A1; WO 2016/065049 A1)

1.      The date for the taking of evidence is scheduled for

| Weekday and date | Time of day | Room/floor/building |
|---|---|---|
| Thursday, October 21, 2021 to Friday, October 22, 2021 | in each case from 10:00 AM | Courtroom 135, 1st floor, Prielmayerstrasse 7 |

**Instructions in accordance with Sections 78, 215 ZPO**
Attorney representation is mandatory before the Regional Courts. Therefore, only an attorney may be appointed as counsel of record or, in consultation with an attorney, a national of a Member State of the European Union or another State that is party to the Agreement on the European Economic Area who is fluent in German and who is entitled in accordance with parts 1 and 5 of the Law on the Activities of European Lawyers in Germany (EuRAG) to temporarily carry out the activities of an attorney. Acts conducted by a party itself are procedurally invalid. If no attorney or no foreign attorney as specified above is acting for the party, a default judgment may be adopted against it. The parties are therefore expressly notified that the failure to appear at a hearing can result in a loss of the case. At the request of the opponent, a default judgment may be adopted against the party failing to appear or a decision reached based on the court records (Sections 330-331a, 251a ZPO); in this case, the defaulting party would also have to bear the court costs and the necessary costs of the opposing side (Section 91 ZPO). Furthermore, the opponent of the defaulting party may conduct compulsory enforcement against you under the default judgment or the judgment on the basis of the court records (Section 708 no. 2 ZPO).

2.      **In accordance with Section 273 of the German Code of Civil Procedure (ZPO), the Court orders:**

2.1.    The personal appearance of the following parties:

Plaintiff Palantir Technologies, Inc.
CEO Alex Karp

Party examination of the following parties:

Defendant Abramowitz Marc

- Page 2 -

The personal appearance is ordered to clarify the facts of the case (Section 141 para. 1 ZPO) and for a conciliation attempt (Section 278 para. 3 ZPO). If one of the parties fails to appear, the Court will generally commence the oral hearing immediately (Section 279 para. 1 sentence 1 ZPO) and, if both parties or their counsel of record fail to appear, order the proceedings to be suspended (Section 278 para. 4 ZPO).

2.2.    The summoning of the following witnesses, specifying the following evidentiary topic:

Sankar Shyam – at Plaintiff's request
Evidentiary topic:
Developments in the course of the "Cyber Mesh" project and the "Nexus Peering" technology as well as disclosure to cooperation partners

Albertson Jacob – at Plaintiff's request
Summons time: 11:00 AM
Evidentiary topic:
Developments in the course of the "Cyber Mesh" project and the "Nexus Peering" technology as well as disclosure to cooperation partners

Hildebrandt Melody – at Plaintiff's request
Summons time: 1:00 PM
Evidentiary topic:
Developments in the course of the "Cyber Mesh" project and the "Nexus Peering" technology as well as disclosure to cooperation partners

Ducott Rick – at Plaintiff's request
Summons time: 2:00 PM
Evidentiary topic:
Developments in the course of the "Cyber Mesh" project and the "Nexus Peering" technology as well as disclosure to cooperation partners

Maag Peter – at Plaintiff's request
Summons time: 3:00 PM
Evidentiary topic:
Developments in the course of the "Cyber Mesh" project and the "Nexus Peering" technology as well as disclosure to cooperation partners

Kimball Marissa – at Plaintiff's request
Summons time: 4:00 PM
Evidentiary topic:
Developments in the course of the "Cyber Mesh" project and the "Nexus Peering" technology as well as disclosure to cooperation partners

Squires John – at Defendant's request
Summons time: 4:00 PM
Evidentiary topic:
Developments in connection with the patent applications in suit (EP 15851807.6 and EP 15852487.6)

- Page  3  -

Singh Hakirat – at Plaintiff's request
Summons time: 1:00 PM
Evidentiary topic:
Developments in the course of the "Cyber Mesh" project and the "Nexus Peering" technology as well as disclosure to cooperation partners

2.3.    The summoning of interpreters for the English language.


signed.

Pichlmaier
Presiding Judge at the Regional Court




Certified to be a true copy
Munich, 8/2/2021

Hofbauer, Court Clerk
Office Registrar

[stamp:] Regional Court of Bavaria

**Landgericht München I**
Abteilung für Zivilsachen



Landgericht München I  80316 München

Rechtsanwälte
Freshfields Bruckhaus Deringer LLP
Maximiliansplatz 13
80333 München

für Rückfragen:
Telefon: (+49) 89 5597-2311
Telefax: (+49) 89 5597-3003
Zimmer: 620
Sie erreichen die zuständige Stelle am besten:
Mo - Do: 08.00 - 15.00 Uhr
und  Fr: 08.00 - 14.00 Uhr

| Ihr Zeichen | **Bitte bei Antwort angeben**<br>Akten- / Geschäftszeichen | Datum |
|---|---|---|
| 171026-0001 WPW/NBa/MKU | 21 O 11054/18 | 02.08.2021 |

In Sachen
Palantir Technologies, Inc. ./. Abramowitz, M.
wg. Forderung (EP 15851807.6; EP 15852487.6; WO 2016/064919 A1; WO 2016/065049 A1)

Sehr geehrte Damen und Herren Rechtsanwälte,

im oben bezeichneten Verfahren wurde Termin zur Beweisaufnahme bestimmt auf:

**Donnerstag, 21.10.2021, bis Freitag, 22.10.2021, jeweils ab 10:00 Uhr, Sitzungssaal 135, 1. Stock, Prielmayerstraße 7.**

Zu diesem Termin werden Sie hiermit geladen.

Das Gericht hat ferner die in der beiliegenden Verfügung enthaltene Anordnung getroffen, die zur Vermeidung von Nachteilen unbedingt zu beachten ist.

Geben Sie bitte bei allen Schreiben das vorstehend aufgeführte Geschäftszeichen an und fügen Sie bitte den Schriftsätzen und Anlagen immer die erforderliche Anzahl von Abschriften / Ablichtungen für die Gegenpartei(en) bzw. sonstige Verfahrensbeteiligte und deren Bevollmächtigte(n) bei.

Im Gerichtsgebäude finden Zugangskontrollen statt, die einige Zeit in Anspruch nehmen können. Um die rechtzeitige Anwesenheit im Termin zu gewährleisten, wird gebeten, mögliche Wartezeiten zu berücksichtigen.

**Hausanschrift**
Lenbachplatz 7,
80316 München

**Haltestelle**
U-Bahn, S-Bahn: Haltestelle
Karlsplatz

**Nachtbriefkasten**
Prielmayerstraße 7,
Pacellistraße 5,
Infanteriestraße 5,
Nymphenburger
Straße 16

**Kommunikation**
Telefon:
089/5597-03
Telefax:
089/5597-2991

Seite  2

Mit freundlichen Grüßen

Hofbauer, JSekr´in
Urkundsbeamtin der Geschäftsstelle

**<u>Datenschutzhinweis:</u>**
Informationen zum Datenschutz finden Sie unter
https://www.justiz.bayern.de/gerichte-und-behoerden/landgericht/muenchen-1/.

Beglaubigte Abschrift

**Landgericht München I**                                               München, 29.07.2021

21 O 11054/18

# Verfügung

In Sachen

Palantir Technologies, Inc. ./. Abramowitz, M. wg. Forderung (EP 15851807.6; EP 15852487.6; WO 2016/064919 A1; WO 2016/065049 A1)

1.    Termin zur Beweisaufnahme wird bestimmt auf

| Wochentag und Datum | Uhrzeit | Zimmer/Etage/Gebäude |
|---|---|---|
| Donnerstag, 21.10.2021 bis Freitag, 22.10.2021 | jeweils ab 10:00 Uhr | Sitzungssaal 135, 1. Stock, Prielmayerstraße 7 |

**Belehrungen gemäß §§ 78, 215 ZPO**

Vor den Landgerichten herrscht Anwaltszwang. Daher kann nur ein Rechtsanwalt oder im Einvernehmen mit einem Rechtsanwalt ein der deutschen Sprache mächtiger Staatsangehöriger eines Mitgliedstaates der Europäischen Union oder eines anderen Vertragsstaates des Abkommens über den Europäischen Wirtschaftsraum, der nach den Teilen 1 und 5 des Gesetzes über die Tätigkeit europäischer Rechtsanwälte in Deutschland (EuRAG) berechtigt ist, vorübergehend die Tätigkeit eines Rechtsanwalts auszuüben, zum Prozessbevollmächtigten bestellt werden. Handlungen, die die Partei selbst vornimmt, sind prozessrechtlich unwirksam. Wird für die Partei kein Rechtsanwalt oder kein vorstehend näher bezeichneter ausländischer Rechtsanwalt tätig, kann gegen sie ein Versäumnisurteil ergehen. Die Parteien werden daher ausdrücklich darauf hingewiesen, dass das Nichterscheinen im Termin zu einem Verlust des Prozesses führen kann. Gegen die nicht erschienene Partei kann auf Antrag des Gegners ein Versäumnisurteil erlassen oder eine Entscheidung nach Aktenlage getroffen werden (§§ 330 bis 331a, 251a ZPO); in diesem Fall hat die säumige Partei auch die Gerichtskosten und die notwendigen Kosten der Gegenseite zu tragen (§ 91 ZPO). Aus dem Versäumnisurteil oder dem Urteil nach Lage der Akten kann der Gegner der säumigen Partei gegen diese die Zwangsvollstreckung betreiben (§ 708 Nr. 2 ZPO).

2.    **Gemäß § 273 ZPO wird angeordnet:**

2.1.    Das persönliche Erscheinen folgender Parteien:

Kläger Palantir Technologies, Inc.
CEO Alex Karp

Parteivernehmung folgender Parteien:

Beklagter Abramowitz Marc

- Seite  2  -

Die Anordnung des persönlichen Erscheinens erfolgt zur Aufklärung des Sachverhalts (§ 141 Abs. 1 ZPO) und für einen Güteversuch (§ 278 Abs. 3 ZPO). Das Gericht wird bei Nichterscheinen einer Partei regelmäßig sofort in die mündliche Verhandlung eintreten (§ 279 Abs. 1 S. 1 ZPO) und bei Nichterscheinen beider Parteien bzw. deren Prozessbevollmächtigten das Ruhen des Verfahrens anordnen (§ 278 Abs. 4 ZPO).

2.2.  Folgende(n) Zeugin/Zeugen unter Angabe jeweils des nachstehenden Beweisthemas laden:

Sankar Shyam - auf Antrag der Klagepartei
Beweisthema:
Entwicklungen im Rahmen des Projekts „Cyber Mesh" und der Technologie „Nexus Peering" sowie Weitergabe an Kooperationspartner

Albertson Jacob - auf Antrag der Klagepartei
Ladungszeit: 11:00 Uhr
Beweisthema:
Entwicklungen im Rahmen des Projekts „Cyber Mesh" und der Technologie „Nexus Peering" sowie Weitergabe an Kooperationspartner

Hildebrandt Melody - auf Antrag der Klagepartei
Ladungszeit: 13:00 Uhr
Beweisthema:
Entwicklungen im Rahmen des Projekts „Cyber Mesh" und der Technologie „Nexus Peering" sowie Weitergabe an Kooperationspartner

Ducott Rick - auf Antrag der Klagepartei
Ladungszeit: 14:00 Uhr
Beweisthema:
Entwicklungen im Rahmen des Projekts „Cyber Mesh" und der Technologie „Nexus Peering" sowie Weitergabe an Kooperationspartner

Maag Peter - auf Antrag der Klagepartei
Ladungszeit: 15:00 Uhr
Beweisthema:
Entwicklungen im Rahmen des Projekts „Cyber Mesh" und der Technologie „Nexus Peering" sowie Weitergabe an Kooperationspartner

Kimball Marissa - auf Antrag der Klagepartei
Ladungszeit: 16:00 Uhr
Beweisthema:
Entwicklungen im Rahmen des Projekts „Cyber Mesh" und der Technologie „Nexus Peering" sowie Weitergabe an Kooperationspartner

Squires John - auf Antrag der Beklagtenpartei
Ladungszeit: 16:00 Uhr
Beweisthema:
Entwicklungen im Zusammenhang mit den Streitpatentanmeldungen (EP 15851807.6 und

- Seite  3  -

EP 15852487.6)

Singh Hakirat - auf Antrag der Klagepartei
Ladungszeit: 13:00 Uhr
Beweisthema:
Entwicklungen im Rahmen des Projekts „Cyber Mesh" und der Technologie „Nexus Pee-ring" sowie Weitergabe an Kooperationspartner

2.3.   Dolmetscher für die Sprache Englisch laden.

gez.

Pichlmaier
Vorsitzender Richter am Landgericht



Für die Richtigkeit der Abschrift
München, 02.08.2021

Hofbauer, JSekr´in
Urkundsbeamtin der Geschäftsstelle

# EXHIBIT A-4

# LIONBRIDGE

STATE OF NEW YORK      )
                                   )
                                   )     ss
COUNTY OF NEW YORK   )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from German into English of the attached Indicative Order and Order to Take Evidence.

Lynda Green, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this _13_ day of _September_ , 20_21_ .

JEFFREY AARON CURETON
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CU6169789
Qualified in New York County
My Commission Expires 09-23-2023

Certified Copy

# Munich I Regional Court

Case no.:        21 O 11054/18



In the matter

**Palantir Technologies, Inc.,** 100 Hamilton Ave, Suite 300, Palo Alto, CA 94301, United States of America
represented by its CEO Alex Karp
- Plaintiff -

<u>Attorneys of record:</u>
Attorneys at Law **Freshfields Bruckhaus Deringer LLP,** Maximiliansplatz 13, 80333 Munich, ref. no.: 171026-0001 WPW/NBa/MKU

versus

**Abramowitz** Marc L., 31 Windward Road, Belvedere Tiburon, CA 94920, United States of America
- Defendant -

<u>Attorneys of record:</u>
Attorneys at Law **Hoffmann & Eitle,** Arabellastrasse 30, 81925 Munich, ref. no.: 208748z5/z10/q8/wng

for claim (EP 15851807.6; EP 15852487.6; WO 2016/064919 A1; WO 2016/065049 A1)

the Munich I Regional Court – 21st Civil Division – through Presiding Judge Pichlmaier at the Regional Court, Judge Dr. Schacht at the Regional Court, and Judge Dr. Walz at the Regional Court, on    July 29, 2021, pronounces the following

# Indicative Order and Order to Take Evidence

**A.**　　　　　**Guidance on the admissibility of the requests as filed**

**I.**　　　　　**Admissibility of request for declaratory relief 1)**

In the Court's view, request 1) is admissible, even taking into account the legal opinion obtained by Defendant. According to the remarks in the expert opinion, the Court should be advised to follow the minority vote of the decision of the EPO G 3/92. The expert opinion ignores the fact that the minority opinion is based in particular on the wording of Article 61 EPC. However, the relevant wording cited by the minority vote has been amended in the meantime. The fact that a patent may "not yet" have been granted can no longer be inferred from Article 61 (1) EPC based on the legal situation that has meanwhile become relevant. Regardless, the argument would not have been convincing according to the previous legal situation, either, because it fails to recognize the legitimate protective interests of an inventor whose technical teaching has wrongly been registered by a third party. Rather, it seems to be precisely the intent and purpose of Article 61 (1) (b) EPC, in case constellations such as the present of the expiry of a patent application filed without authorization, to continue to allow the actual inventor to have patent protection. According to German law, this may have to be assessed differently following the decision of the German Federal Court of Justice (BGH) in the "*Drahtbiegemaschine*" [Wire bending machine] case. In the case at hand, though, the EPC is to be applied, which is to be autonomously interpreted as such in the view of the Court.

## II.            Admissibility of the requests for declaratory relief 2) and 3)

According to the Court's preliminary opinion, requests for declaratory relief 2) and 3) are also admissible. This view is based on the following considerations:

The determination of liability for damages assumes the possibility of the occurrence of damage, where it suffices that, based on life experience and the ordinary course of events, there is a sufficient probability that damage only arising from the legal relationship in the future can be assumed (BGH, NJW-RR 2015, 626, 627, margin no. 11). In the case of pure financial losses, which are at issue presently, the admissibility of the action for declaratory relief also depends on the sufficient probability of the occurrence of damage attributable to the breach of duty; this is lacking if the occurrence of any (further or future) damage is uncertain (BGH, op. cit.; BGH, NJW-RR 2019, 1332, 1335, margin no. 41). According to the BGH, therefore, the decisive factor is whether, on the basis of Plaintiff's statements, damage attributable to the infringing act was likely or whether, on the basis of Plaintiff's statements, the occurrence of any damage had to be regarded as uncertain (cf. BGH, NJW-RR 2015, 626, 627, margin no. 14).

According to the request and the submission by Plaintiff, motions for the declaration of damages 2) and 3) cover damage that Plaintiff claims to have suffered as a result of the fact that the unjustified applications were not pursued and therefore have to be filed anew. This damage could not yet be quantified, because it could not yet be foreseen when the newly filed patent applications will be granted (page 24 of the statement of claim of August 6, 2018). In addition, though, damage was also possible with sufficient probability because Plaintiff was prevented from its own use of the inventions in question in the period between the filing of the patent applications in suit and the possible new filing of the inventions in dispute (page 39 of the reply of February 21, 2020, page 214 of the record). In the Court's view, this line of argument is understandable and is sufficient for the finding of the admissibility of the motions for the declaration of damages. Because even if

claims for injunctive relief only come into consideration once a patent has been granted, it is still comprehensible that an undertaking would refrain from entering the market in order to avoid claims for compensation in accordance with Section 33 para. 1 of the German Patent Act (PatG).

**III.          Substantiation of the alleged claims for damages**

Irrespective of this, however, the question of the merits of the asserted claims for damages must be assessed. In this respect, the Court has considerable doubts about the adequate substantiation of Plaintiff's submission.

As already emphasized at the oral hearing, claims for damages in the case of alleged unauthorized patent applications only come into consideration from a substantive-law perspective if the inventions in dispute are eligible for patent protection in the first place (BGH, GRUR 2010, 817, 820, margin no. 28 – *Steuervorrichtung* [Control device]). On the basis of Plaintiff's submission, though, it cannot be assessed whether and, if so, to what extent patent protection will be and can be granted. In the Court's view, this applies independently of the question of whether Plaintiff has filed new patent applications and, if necessary, made a request under Rule 14 EPC to suspend the grant procedure and conduct the present proceedings. There is at any rate no substantiated submission as to whether and to what extent the alleged inventions of Plaintiff differ in an inventive manner from the relevant prior art. In particular, a corresponding submission cannot be replaced by references to evaluations by the U.S. and Korean patent offices (page 223 et seqq. of the record). An ex officio examination – unlike in the examination procedure before the patent office – does not come into consideration according to the civil procedural principles that are relevant for the Court.

Likewise, there is no adequately substantiated presentation on the fact that Plaintiff was unable to place specific products on the market precisely because of the patent applications in suit.

**B.**               **Taking of evidence**

In the scope of the action found to be admissible, the next step is to gather evidence regarding by whom and when the disputed inventions were completed, whether Plaintiff had the necessary ownership of the inventions accordingly and whether and, if so, how Defendant received the knowledge from Plaintiff that was necessary for the disputed applications.

**I.**   **Evidence shall be taken on the following evidentiary topics and allegations raised by Plaintiff:**

1.   The core aspects of the inventions go back to developments carried out by Plaintiff in the period from 2013 to the first half of 2014 as part of the "Cyber Mesh" project and the "Nexus Peering" technology.

   The inventions in dispute were developed by a project team of Plaintiff. The individual members of the project team transferred the rights to which they are entitled to Plaintiff. (page 185/191, 364/368 of the record)

   - **Shyam Sankar as witness, addressed for service care of Plaintiff**

   - **Jacob Albertson as witness, addressed for service care of Plaintiff**

   - **Melody Hildebrandt as witness, addressed for service care of Plaintiff**

   - **Harkirat Singh as witness, addressed for service care of Plaintiff**

   - **Rick Ducott as witness, addressed for service care of Plaintiff**

   - **Peter Maag as witness, addressed for service care of Plaintiff**

   - **Marissa Kimball as witness, addressed for service care of Plaintiff**

2.   The "Horsepower" project included the cyber insurance invention, which made it possible to determine and evaluate various parameters that are relevant for the evaluation of insurance cover in the cyber context (among other things by using data from the "Cyber Mesh").

   - **Shyam Sankar as witness, addressed for service care of Plaintiff**

3.      A technology such as "Cyber Mesh" took many years to develop and cost hundreds of millions of dollars. (page 367/368 of the record)

     -   **Shyam Sankar as witness, addressed for service care of Plaintiff**

4.      The "Cyber Mesh" product was already marketable in November 2013 and was advertised to important customers. (page 368 of the record, Exhibit FBD-V 35)

     -   **Marissa Kimball as witness, addressed for service care of Plaintiff**

5.      Plaintiff's employees wanted to use the "Cyber Mesh" product and in particular the "Horsepower" project to provide innovative and flexible insurance solutions. (page 371 of the record)

     -   **Shyam Sankar as witness, addressed for service care of Plaintiff**

     -   **Jacob Albertson as witness, addressed for service care of Plaintiff**

     -   **Marissa Kimball as witness, addressed for service care of Plaintiff**

6.      Melody Hildebrandt presented developments in the field of cyber insurance to AXA Versicherung in January 2014. (page 371/372 of the record, Exhibit FBD-V 37)

     -   **Melody Hildebrandt as witness, addressed for service care of Plaintiff**

7.      Another cooperation in the area of cyber insurance was discussed with ZURICH-Versicherung. (page 373/374 of the record, Exhibit FBD-V 38)

     -   **Shyam Sankar as witness, addressed for service care of Plaintiff**

8.      Core aspects of the inventions in dispute. (page 181/183, 215/218, 374/381 of the record)

     -   **Shyam Sankar as witness, addressed for service care of Plaintiff**

     -   **Marissa Kimball as witness, addressed for service care of Plaintiff**

     -   **Jacob Albertson as witness, addressed for service care of Plaintiff**

9.      In his role as a consultant, Plaintiff's employee, Shyam Sankar, communicated the core
        aspects of the disputed inventions confidentially to Defendant by email on 06/09/2014 and
        in a personal meeting on 06/10/2014. (page 183, 381/385 of the record)

        -   **Shyam Sankar as witness, addressed for service care of Plaintiff**

II.     **(Counter) evidence shall be taken on the following evidentiary topics and
        allegations raised by Defendant:**

1.      Plaintiff's employees did not notify Defendant of a finished invention. The email from
        Shyam Sankar dated June 9, 2014 (Exhibit FBD 6) only describes the non-technical idea
        of cyber insurance. (page 153 of the record)

        -   **Party examination of Defendant**

2.      In a meeting on 6/10/2014, Defendant was not given any further details on the inventions
        in dispute. The relatively short meeting pertains solely to the commercial implementation
        of the idea and related real estate deals. (page 154 of the record)

        -   **Party examination of Defendant**

3.      The patent applications in suit go back to an earlier patent application filed by Defendant
        in March 2014. Having regard to negative experiences in connection with the 2008
        financial crisis, Defendant recognized a need for a better way of valuing bonds. By 2012,
        Defendant had conceived the use of real-time dynamic data to create and disseminate
        more accurate ratings for corporate and municipal bonds. He later hired John Squires and
        his law firm Perkins Coie LLP to help him obtain patent protection for his ideas. An
        invention based on the use of dynamic real-time information was discussed in November
        2013 and filed on 3/05/2014 as US'766. (page 318/319 of the record)

        -   **John Squires as witness, addressed for service care of Defendant**

4.    The patent applications in suit are conceptually very similar to Defendant's earlier application US'766 (Exhibit HE 7). Defendant developed US'766 with his patent attorney and his employees as the subject matter of the priority application. ==(page 319, 293/296 of the record)==

-    **John Squires as witness, addressed for service care of Defendant**

**III.    The taking of evidence by examining the witnesses concerned is dependent in each case on**

1.    Plaintiff paying an advance payment of € 35,000.00 (€ 5,000.00 per witness) to the Court by September 30, 2021 and providing evidence of this to the Court within the same period or submitting a waiver of expenses,

2.    Defendant paying an advance payment of € 5,000.00 to the court by September 30, 2021 and providing evidence of this to the Court within the same period or submitting a waiver of expenses,

**IV.    We reserve the right to amend the order to take evidence.**

signed

| Pichlmaier | Dr. Schacht | Dr. Walz |
|---|---|---|
| Presiding Judge at the Regional Court | Judge at the Regional Court | Judge at the Regional Court |

at the same time for Judge at the Regional Court Dr. Schacht, who was absent due to vacation

Certified to be a true copy

Munich, August 2, 2021

[stamp:]

Regional Court of Bavaria

Hofbauer, Court Clerk

Office Registrar

# Payment instructions for the order to take evidence

**You can pay the amount as follows:**

**Transfer or payment to the following bank account:**

| | | | |
|---|---|---|---|
| Bank: | Bayerische Landesbank Munich | Recipient: | Landesjustizkasse Bamberg |
| Bank sort code: | 70050000 | Account number: | 3024919 |
| BIC: | BYLADEMMXXX | IBAN: | DE78 7005 0000 0003 0249 19 |

**Court fee stamp**

**Please specify the court, the case number and the name of the matter, as proper booking is otherwise impossible and the payment cannot be notified to the court** (example: Munich I Regional Court, 21 O 11054/18, Palantir Technologies, Inc v. Abramowitz, M. re claim (EP 15851807.6; EP 15852487.6; WO 2016/064919 A1; WO 2016/065049 A1)).

Beglaubigte Abschrift

# Landgericht München I

Az.:     21 O 11054/18



In dem Rechtsstreit

**Palantir Technologies, Inc.**, 100 Hamilton Ave, Suite 300, Palo Alto, CA 94301, Vereinigte Staaten von Amerika
vertreten durch ihren CEO Alex Karp
- Kläger -

Prozessbevollmächtigte:
Rechtsanwälte **Freshfields Bruckhaus Deringer LLP**, Maximiliansplatz 13, 80333 München,
Gz.: 171026-0001 WPW/NBa/MKU

gegen

**Abramowitz** Marc L., 31 Windward roard, belvedere Tiburon, CA 94920, Vereinigte Staaten von
Amerika
- Beklagter -

Prozessbevollmächtigte:
Rechtsanwälte **Hoffmann & Eitle**, Arabellastraße 30, 81925 München, Gz.:
208748z5/z10/q8/wng

wegen Forderung (EP 15851807.6; EP 15852487.6; WO 2016/064919 A1; WO 2016/065049 A1)

21 O 11054/18                                   - Seite  2  -

erlässt das Landgericht München I - 21. Zivilkammer - durch den Vorsitzenden Richter am Landgericht Pichlmaier, den Richter am Landgericht Dr. Schacht und den Richter am Landgericht Dr. Walz am 29.07.2021 folgenden

# Hinweis- und Beweisbeschluss

**A.**      **Hinweis zur Zulässigkeit der gestellten Anträge**

**I.**      **Zulässigkeit des Feststellungsantrages zu 1)**

Nach Ansicht der Kammer ist der Antrag zu 1) auch unter Berücksichtigung des von der Beklagten erholten Rechtsgutachtens zulässig. Nach den Ausführungen des Gutachtens soll dem Gericht nahegelegt werden, dem Minderheitsvotum der Entscheidung des EPA G 3/92 zu folgen. Dabei blendet das Gutachten aus, dass die Minderheitsmeinung insbesondere auf den Wortlaut des Art. 61 EPÜ abstellt. Der einschlägige Wortlaut, auf den sich das Minderheitsvotum beruft, wurde indes zwischenzeitlich geändert. Dass ein Patent „noch nicht" erteilt worden sein darf, ist Art. 61 Abs. 1 EPÜ nach der zwischenzeitlich maßgeblichen Gesetzeslage gerade nicht mehr zu entnehmen. Ohnehin hätte das Argument aber bereits nach früherer Rechtslage nicht überzeugt, weil dies die berechtigen Schutzinteressen eines Erfinders verkennt, dessen technische Lehre zu Unrecht von einem Dritten angemeldet wurde. Vielmehr scheint es gerade der Sinn und Zweck von Art. 61 Abs. 1 lit. b) EPÜ zu sein, in wie hier vorliegenden Fallkonstellationen eines Erlöschens einer unberechtigt eingereichten Patentanmeldung dem eigentlichen Erfinder weiterhin Patentschutz zu ermöglichen. Dies mag nach deutschem Recht im Anschluss an die Entscheidung des BGH in Sachen „Drahtbiegemaschine" abweichend zu beurteilen sein. Vorliegend ist jedoch das aus Sicht der Kammer als solches autonom auszulegende EPÜ anzuwenden.

## II.    Zulässigkeit der Feststellungsanträge zu 2) und 3)

Die Feststellungsanträge zu 2 und 3 sind nach vorläufiger Ansicht der Kammer ebenfalls zulässig. Diese Ansicht beruht auf folgenden Erwägungen:

Die Feststellung der Schadensersatzpflicht setzt die Möglichkeit eines Schadenseintritts voraus. Ausreichend ist dabei, dass nach der Lebenserfahrung und dem gewöhnlichen Verlauf der Dinge mit hinreichender Wahrscheinlichkeit ein erst künftig aus dem Rechtsverhältnis erwachsender Schaden angenommen werden kann (BGH, NJW-RR 2015, 626, 627, Rn. 11). Bei reinen Vermögensschäden, die vorliegend in Rede stehen, hängt die Zulässigkeit der Feststellungsklage darüber hinaus von der hinreichenden Wahrscheinlichkeit eines auf die Pflichtverletzung zurückgehenden Schadenseintritts ab; hieran fehlt es, wenn der Eintritt irgendeines (weiteren oder künftigen) Schadens ungewiss ist (BGH, a.a.O.; BGH, NJW-RR 2019, 1332, 1335, Rn. 41). Dem BGH zufolge ist daher entscheidend, ob auf Grund der Darlegungen der Klägerin ein auf die Verletzungshandlung zurückzuführender Schaden wahrscheinlich war oder ob auf der Grundlage der Darlegungen der Klägerin der Eintritt irgendeines Schadens noch als ungewiss angesehen werden musste (vgl. BGH, NJW-RR 2015, 626, 627, Rn. 14).

Dem Antrag und klägerseitigen Vortrag nach erfassen die Schadensersatzfeststellungsanträge zu 2) und 3) Schäden, die der Klägerin nach eigener Behauptung dadurch entstanden sind, dass die unberechtigt erfolgten Anmeldungen nicht weiterverfolgt wurden und damit neu eingereicht werden müssen. Dieser Schaden sei noch nicht bezifferbar, weil noch nicht absehbar sei, wann es zu einer Erteilung der neu eingereichten Patentanmeldungen kommen wird (Seite 24 der Klageschrift vom 06.08.2018). Darüber hinaus sei ein Schaden aber auch deswegen mit der hinreichenden Wahrscheinlichkeit möglich, weil sich die Klägerin im Zeitraum zwischen der Einreichung der Klagepatentanmeldungen und der eventuellen Neuanmeldung der streitgegenständlichen Erfindungen an einer eigenen Nutzung der entsprechenden Erfindungen gehindert sah (S. 39 der Replik vom 21.02.2020, Bl. 214 d. Akte). Diese Argumentation ist nach Ansicht der Kammer nachvollziehbar und genügt für die Annahme der Zulässigkeit der Schadensersatzfeststellungsanträge. Denn auch wenn Unterlassungsansprüche erst ab Erteilung eines Patents in Betracht kommen, ist es doch

nachvollziehbar, dass ein Unternehmen zur Vermeidung von Entschädigungsansprüchen gemäß § 33 Abs. 1 PatG von einem Markteintritt absieht.

**III.        Substantiierung der behaupteten Schadensersatzansprüche**

Davon unabhängig ist aber die Frage nach der Begründetheit der geltend gemachten Schadensersatzansprüche zu beurteilen. Die Kammer hat insoweit erhebliche Zweifel an der hinreichenden Substantiierung des Vortrags der Klägerin.

Wie in der mündlichen Verhandlung bereits betont, kommen Schadensersatzansprüche im Falle behaupteter unberechtigter Patentanmeldungen materiell-rechtlich dem Grunde nach überhaupt nur dann in Betracht, wenn die streitgegenständlichen Erfindungen patentschutzfähig sind (BGH, GRUR 2010, 817, 820, Rn. 28 – *Steuervorrichtung*). Auf der Grundlage des Klägervortrages lässt sich indes nicht beurteilen, ob und gegebenenfalls in welchem Umfang Patentschutz erteilt wird und erteilt werden kann. Dies gilt nach Ansicht der Kammer unabhängig von der Frage, ob die Klägerin neue Patentanmeldungen eingereicht und gegebenenfalls einen Antrag nach Regel 14 EPÜ zur Aussetzung der Erteilungs- und Durchführung des vorliegenden Verfahrens gestellt hat. Denn jedenfalls fehlt substantiierter Vortrag dazu, dass und inwieweit sich die vermeintlichen Erfindungen der Klägerin in erfinderischer Weise von dem relevanten Stand der Technik abheben, völlig. Entsprechender Vortrag kann insbesondere nicht durch Hinweise auf Einschätzungen des US-amerikanischen und koreanischen Patentamts ersetzt werden (Bl. 223 ff. d. Akte). Eine Amtsermittlung kommt – anders als in den patentamtlichen Prüfungsverfahren – nach den für die Kammer maßgeblichen zivilprozessualen Grundsätzen nicht in Betracht.

Ebenso fehlt hinreichend substantiierter Vortrag dazu, dass die Klägerin gerade wegen der erfolgten Streitpatentanmeldungen konkrete Produkte nicht auf den Markt bringen konnte.

**B.        Beweiserhebung**

Im Umfang der für zulässig befundenen Klage ist in einem nächsten Schritt Beweis darüber zu erheben, von wem und wann die streitgegenständlichen Erfindungen fertiggestellt wurden, ob dementsprechend auf Seiten der Klägerin der erforderliche Erfindungsbesitz vorlag und ob und gegebenenfalls wie der Beklagte die für die streitgegenständlichen Anmeldungen erforderlichen Kenntnisse von der Klägerseite erhalten hat.

**I.    Es wird Beweis erhoben zu folgenden Beweisthemen und Behauptungen der Klägerin:**

1.    Die Kernaspekte der Erfindungen gehen auf im Zeitraum 2013 bis erste Hälfte des Jahres 2014 von der Klägerin durchgeführte Entwicklungen im Rahmen des Projekts „Cyber Mesh" und der Technologie „Nexus Peering" zurück.

Die streitgegenständlichen Erfindungen sind durch ein Projektteam der Klägerin entwickelt worden. Die einzelnen Mitglieder des Projektteams haben die ihnen zustehenden Rechte an die Klägerin übertragen. (Bl. 185/191, 364/368 d. Akte)

-    **Shyam Sankar als Zeuge, zu laden über die Klägerin**

-    **Jacob Albertson als Zeuge, zu laden über die Klägerin**

-    **Melody Hildebrandt als Zeugin, zu laden über die Klägerin**

-    **Harkirat Singh als Zeuge, zu laden über die Klägerin**

-    **Rick Ducott als Zeuge, zu laden über die Klägerin**

-    **Peter Maag als Zeuge, zu laden über die Klägerin**

-    **Marissa Kimball als Zeugin, zu laden über die Klägerin**

2.    Das Projekt „Horsepower" beinhaltete die Cyber-Versicherungs-Erfindung, die es ermöglichte, verschiedene, für die Bewertung von Versicherungsschutz maßgebliche Parameter im Cyber-Kontext (u.a. durch Rückgriff auf Daten aus dem „Cyber Mesh") zu ermitteln und auszuwerten.

-    **Shyam Sankar als Zeuge, zu laden über die Klägerin**

- Seite  6  -

3.　Die Entwicklung einer Technologie wie „Cyber Mesh" nahm viele Jahre in Anspruch und kostete hunderte Millionen US-Dollar. (Bl. 367/368 d. Akte)

-　**Shyam Sankar als Zeuge, zu laden über die Klägerin**

4.　Das Produkt „Cyber Mesh" war bereits im November 2013 vermarktungsfähig und wurde bei wichtigen Kunden beworben. (Bl. 368 d. Akte, Anlage FBD-V 35)

-　**Marissa Kimball als Zeugin, zu laden über die Klägerin**

5.　Die Mitarbeiter der Klägerin wollten das Produkt „Cyber Mesh" und insbesondere das Projekt „Horsepower" nutzen, um neuartige und flexible Versicherungslösungen bereitzustellen. (Bl. 371 d. Akte)

-　**Shyam Sankar als Zeuge, zu laden über die Klägerin**

-　**Jacob Albertson als Zeuge, zu laden über die Klägerin**

-　**Marissa Kimball als Zeugin, zu laden über die Klägerin**

6.　Entwicklungen im Bereich Cyber Versicherung wurden von Melody Hildebrandt im Januar 2014 bei der AXA Versicherung präsentiert. (Bl. 371/372 d. Akte, Anlage FBD-V 37)

-　**Melody Hildebrandt als Zeugin, zu laden über die Klägerin**

7.　Eine weitere Kooperation im Bereich Cyber Versicherung wurde mit der ZURICH-Versicherung diskutiert. (Bl. 373/374 d. Akte, Anlage FBD-V 38)

-　**Shyam Sankar als Zeuge, zu laden über die Klägerin**

8.　Kernaspekte der streitgegenständlichen Erfindungen. (Bl. 181/183, 215/218, 374/381 d. Akte)

-　**Shyam Sankar als Zeuge, zu laden über die Klägerin**

-　**Marissa Kimball als Zeugin, zu laden über die Klägerin**

-　**Jacob Albertson als Zeuge, zu laden über die Klägerin**

9.　Die Kernaspekte der streitgegenständlichen Erfindungen hat der Mitarbeiter der Klägerin Shyam Sankar per E-Mail am 09.06.2014 und in einem persönlichen Treffen am 10.06.2014 dem Beklagten vertraulich in dessen Rolle als Berater mitgeteilt. (Bl.

183, 381/385 d. Akte)

- **Shyam Sankar als Zeuge, zu laden über die Klägerin**


II.    **Es wird (Gegen-)Beweis erhoben zu folgenden Beweisthemen und Behauptungen der Beklagtenpartei:**

1.    Die Mitarbeiter der Klägerin haben dem Beklagten keine fertige Erfindung mitgeteilt. Die E-Mail von Shyam Sankar vom 09.06.2014 (Anlage FBD 6) beschreibe nur die nicht-technische Idee einer Cyber-Versicherung. (Bl. 153 d. Akte)

- **Parteivernehmung des Beklagten**

2.    Dem Beklagten wurden in einem Gespräch vom 10.06.2014 keine näheren Details zu den streitgegenständlichen Erfindungen mitgeteilt. In dem relativ kurzen Gespräch ging es nur um die geschäftliche Umsetzung der Idee und verbundene Immobiliengeschäfte. (Bl. 154 d. Akte)

- **Parteivernehmung des Beklagten**

3.    Die Streitpatentanmeldungen gehen auf eine frühere, bereits im März 2014 eingereichte Patentanmeldung des Beklagten zurück. Mit Blick auf negative Erfahrungen im Zusammenhang mit der Finanzkrise 2008 erkannte der Beklagte einen Bedarf für eine bessere Methode zur Bewertung von Anleihen. Bis 2012 konzipierte der Beklagte die Verwendung dynamischer Echtzeitdaten zur Erstellung und Verbreitung präziserer Ratings für Unternehmens- und Kommunalanleihen. Später beauftragte er John Squires und dessen Anwaltskanzlei Perkins Coie LLP, ihn bei der Erlangung von Patentschutz für seine Ideen zu unterstützen. Eine Erfindung, die auf der Verwendung dynamischer Echtzeitinformationen basierte, wurde im November 2013 diskutiert und am 05.03.2014 als US'766 eingereicht. (Bl. 318/319 d. Akte)

- **John Squires als Zeuge, zu laden über den Beklagten**

21 O 11054/18                                      - Seite 8 -

4.  Die Streitpatentanmeldungen seien der früheren Anmeldung US'766 der Beklagten (Anlage HE 7) konzeptionell stark ähnlich. Die US'766 habe der Beklagte mit seinem Patentanwalt und dessen Mitarbeitern zum Gegenstand der Prioritätsanmeldung entwickelt. (Bl. 319, 293/296 d. Akte)

   -  **John Squires als Zeuge, zu laden über den Beklagten**

**III.   Die Beweisaufnahme durch Vernehmung der betreffenden Zeugen ist jeweils davon abhängig, dass**

1.  die Klägerin bis zum 30.09.2021 einen Auslagenvorschuss in Höhe von 35.000,00 € (5.000,00 € pro Zeuge) bei Gericht einbezahlt und dies binnen selbiger Frist gegenüber dem Gericht nachweist oder eine Auslagenverzichtserklärung vorlegt,

2.  die Beklagte bis zum 30.09.2021 einen Auslagenvorschuss in Höhe von 5.000,00 € bei Gericht einbezahlt und dies binnen selbiger Frist gegenüber dem Gericht nachweist oder eine Auslagenverzichtserklärung vorlegt.

**IV.   Eine Ergänzung des Beweisbeschlusses bleibt vorbehalten.**

gez.

Pichlmaier                    Dr. Schacht                    Dr. Walz
Vorsitzender Richter          Richter                       Richter
am Landgericht                am Landgericht                am Landgericht
zugleich für den urlaubsab-
wesenden RiLG Dr. Schacht



Für die Richtigkeit der Abschrift
München, 02.08.2021

Hofbauer, JSekr´in
Urkundsbeamtin der Geschäftsstelle

# <u>Zahlungsbelehrung zum Beweisbeschluss</u>

**Den Betrag können Sie wie folgt bezahlen:**

**Überweisung bzw. Einzahlung auf folgendes Bankkonto:**

| | | | |
|---|---|---|---|
| Bank: | Bayerische Landesbank München | Empfänger: | Landesjustizkasse Bamberg |
| Bankleitzahl: | 70050000 | Kontonummer: | 3024919 |
| BIC: | BYLADEMMXXX | IBAN: | DE78 7005 0000 0003 0249 19 |

**Gerichtskostenstempler**

**Bitte geben Sie jeweils das Gericht, das Aktenzeichen sowie die Bezeichnung der Sache an, da sonst eine ordnungsgemäße Verbuchung nicht möglich ist und die Zahlung dem Gericht nicht mitgeteilt werden kann** (Beispiel: LG München I, 21 O 11054/18, Palantir Technologies, Inc. ./. Abramowitz, M. wg. Forderung (EP 15851807.6; EP 15852487.6; WO 2016/064919 A1; WO 2016/065049 A1)).